NICHOLAS A. TRUTANICH
United States Attorney
District of Nevada
Nevada Bar No. 13644
PATRICK BURNS
Nevada Bar No. 11779
CRISTINA D. SILVA
Nevada Bar No. 13760
NICHOLAS D. DICKINSON
Assistant United States Attorneys
501 Las Vegas Blvd. South, Ste. 1100
Las Vegas, Nevada 89101
Phone: (702) 388-5069 / Fax: (702) 388-5087
john.p.burns@usdoj.gov
cristina.silva@usdoj.gov
nicholas.dickinson@usdoj.gov

*Representing the United States of America*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
**-oOo-**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>  **Plaintiff,**<br><br>  **vs.**<br><br> **DOUGLAS HAIG,**<br><br>  **Defendant.** | **Case No.: 2:18-cr-00256-JCM-VCF**<br><br>**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S "MOTION TO PRECLUDE IRRELEVANT AND UNDULY PREJUDICIAL EVIDENCE" [ECF No. 40]** |

The United States of America, by and through NICHOLAS A. TRUTANICH, United States Attorney, and PATRICK BURNS, CRISTINA D. SILVA, and NICHOLAS D. DICKINSON, Assistant United States Attorneys, hereby respectfully submits this Response in Opposition to Defendant's "Motion to Preclude Irrelevant and Unduly Prejudicial Evidence" [ECF No. 40].

1

2

## I.     Factual and Procedural Background

3

This case arises out of the investigation into the October 1, 2017 mass shooting committed

4

by Stephen Paddock (Paddock) at the Route 91 Harvest musical festival. In the Mandalay Bay

5

hotel suites from which Paddock staged his attack, investigators located a box with a shipping

6

label bearing Defendant Douglas Haig (Haig)'s name and Mesa, Arizona address.[1] Beginning on

7

October 2, 2017, agents from the Federal Bureau of Investigation (FBI) and the Bureau of

8

Alcohol Tobacco, Firearms and Explosives (ATF) began a series of interviews with Haig. Haig

9

admitted to meeting Paddock and selling him ammunition in both Las Vegas and Arizona on

10

August 27 and September 19, 2017, respectively. Haig admitted to traveling to gun shows to sell

11

ammunition. He admitted that he reloads ammunition,[2] but claimed he did so for personal use

12

only. He denied selling reloaded ammunition. Haig denied that any of the ammunition recovered

13

from the October 1 crime scene would have reloading marks consistent with the reloading

14

equipment at his home.

15

A latent fingerprint examination revealed that Haig's fingerprints were on two pieces of

16

.308/7.62 caliber ammunition removed from a magazine located in Paddock's room. A forensic

17

firearms examination determined that those pieces of ammunition had toolmarks consistent with

18

being reloaded, and were armor piercing and incendiary in nature. Investigators determined that

19

Haig operated an ammunition business known as Specialized Military Ammunition (SMA).

20

Haig used SMA to sell ammunition to customers in other states over the internet.[3] SMA

21

advertised the sale of armor piercing (AP), armor piercing incendiary (API), and high explosive

22

23

[1] Mesa is a suburb twenty miles east of Phoenix.
[2] Reloading is the mechanical process of assembling the component parts of an ammunition cartridge (bullet (projectile), gunpowder, primer, and cartridge case) into a finished piece of ammunition that can be fired out of a firearm.
[3] Haig operated this business under an Arizona registered Limited Liability Company.

24

armor piercing incendiary ammunition (HEAPI).

On October 24, 2017, a search warrant was executed on Haig's residence. Agents seized hundreds of pounds of ammunition and ammunition components. Haig had ammunition or firearms-related equipment in virtually every room of the residence, and a workshop had been converted into a three-reloading press manufactory for ammunition.[4] Numerous packages of API, AP, HEAPI, and other types of ammunition were packaged for sale with price tags affixed to them. Some of these packages contained Haig's SMA business cards. Haig also had bags and boxes of projectiles for assembling AP, API, and tracer ammunition. Haig's residence contained professional-looking SMA invoice tablets reflecting ammunition sales and numerous records showing that he sold AP, API, and HEAPI to scores of customers throughout the United States in more than twenty states. Based on interviews and review of these records, investigators identified four purchasers (besides Paddock) for whom Haig had either shipped armor piercing ammunition to Nevada or made a sale at a Las Vegas gun show. This review showed that Haig had sold ammunition at Las Vegas gun shows in at least 2016 and 2017.

The reloading presses from Haig's residence were forensically examined and compared to ammunition recovered from the October 1 crime scene and Haig's residence. As to the October 1 scene, the armor piercing ammunition with Haig's latent prints had reloading toolmarks identified as being created by one of the reloading presses at Haig's residence. Armor piercing and incendiary ammunition loaded into five of Paddock's rifles had toolmarks identified as being created by that same reloading press. Armor piercing ammunition rounds recovered from Haig's workshop had reloading toolmarks identified as being made by the reloading press that made the ammunition in Paddock's rifles.

---

[4] Haig was taking steps to automate this reloading assembly line.

On August 22, 2018, a grand jury in the District of Nevada returned an indictment charging Haig with one count of Engaging in the Business of Manufacturing Ammunition Without a License (18 U.S.C. §§ 922(a)(1)(B); 924(a)(1)(D)). ECF No. 10. On September 5, 2018, Haig filed a "Motion to Transfer Proceedings to District of Arizona." ECF No. 18. The government filed its response in opposition on September 17, 2018, and the Court denied the motion.[5]

On January 7, 2019, Haig filed a "Motion to Preclude Irrelevant and Unduly Prejudicial Evidence." ECF No. 40. The motion attaches a proposed order providing "that the Government is precluded from introducing evidence connecting the Defendant to Steven [*sic*] Paddock and/or the October 2017-mass shooting in Las Vegas, including testimony evidence was found in hotel suites and the evidence was found on October 1, 2017." ECF No. 40-1. Haig's request appears to seek exclusion of evidence that Haig, on multiple occasions sold Paddock ammunition that was manufactured on Haig's reloading press, as well as all the investigation and forensic examination of that evidence. The Government's response in opposition follows.

## MEMORANDUM OF POINTS AND AUTHORITIES

### II.   Argument

#### A. Legal Standard for Relevant Evidence and the Exclusion of Irrelevant and Unfairly Prejudicial Evidence Under Federal Rules of Evidence 401-403

Federal Rule of Evidence 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Rule 402 provides in part that "[i]rrelevant evidence is not admissible." Rule 403 permits a district court to exclude relevant evidence if the

---

[5] Haig's instant motion in limine incorrectly claims that the motion to transfer venue is still pending. ECF No. 40 n.2.

evidence's probative value is substantially outweighed by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Evidence is unfairly prejudicial if it suggests a decision on an improper basis. *See* Fed. R. Evid. 403 Advisory Committee's Note. "[E]vidence is not prejudicial merely because it damages the opposing party's case." *United States v. Medina*, 755 F.2d 1269, 1274 (7th Cir.1985) (quoting *West v. Love*, 776 F.2d 170, 174 (7th Cir. 1985)). "Under the terms of the rule, the danger of prejudice must not merely outweigh the probative value of the evidence, but *substantially* outweigh it." *United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995) (emphasis original).

District court judges enjoy broad discretion to deny exclusion of evidence under Rule 403, and their determinations will not be disturbed on appeal absent an abuse of that discretion. *Wood v. Alaska*, 957 F.2d 1544, 1550 (9th Cir. 1992) ("Because trial judges have broad discretion both to determine relevance and to determine whether prejudicial effect or other concerns outweigh the probative value of the evidence, we will find a [constitutional] violation only if we conclude that the trial court abused its discretion."). The Ninth Circuit has stated that exclusion of evidence under Rule 403 is "'an extraordinary remedy to be used sparingly because it permits the trial court to exclude otherwise relevant evidence.'" *United States v. Patterson*, 819 F.2d 1495, 1505 (9th Cir. 1987) (quoting *United States v. Meester*, 762 F.2d 867, 874–75 (11th Cir.), *cert. denied*, 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985)). The Ninth Circuit has also long recognized the effectiveness of limiting instructions in mitigating a risk of prejudice attaching to particular evidence. *See, e.g.*, *United States v. Montgomery*, 150 F.3d 983, 1001 (9th Cir. 1998). And in reviewing Rule 403 decisions, the Ninth Circuit "'presume[s] that juries will follow the district court's limiting instructions.'" *United States v. Norris*, 423 F. App'x 732, 734 (9th Cir. 2011) (quoting *United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995)).

**B. Haig's Multiple Sales of Ammunition to Stephen Paddock, His Statements About Those Sales, and the Firearms Evidence Recovered from Paddock's Suite Constitute the Core of the Government's Evidence that Haig Engaged in the Business of Manufacturing Ammunition Without a License**

**(i) Haig's Repeat Sales of Armor Piercing and Incendiary Ammunition to Paddock and the Recovery of that Manufactured Ammunition from Paddock's Suite and Five Rifles is Clearly Relevant to Proving that Haig Engaged in the Unlicensed Business of Manufacturing Ammunition**

The Ninth Circuit affirms the admissibility of "evidence constituting 'a part of the transaction that serves as the basis for the criminal charge.'" *United States v. Anderson*, 741 F.3d 938, 949 (9th Cir. 2013) (*quoting Dorsey*, 677 F.3d at 951). The doctrine also encompasses evidence that is "'necessary to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime.'… because '[t]he jury cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge.'" *Id.* (*quoting Dorsey* and *United States v. Vizcarra–Martinez*, 66 F.3d 1006, 1012 (9th Cir. 1995)). "This includes circumstantial evidence explaining the general nature of a defendant's business activity and providing a context in which the transactions at issue took place." *Id.* at 949–50 (*citing United States v. King*, 200 F.3d 1207, 1215 (9th Cir. 1999)). Indeed, that jury has an entitlement to know the contextual factors of the crime and its investigation. *United States v. Roberts*, 548 F.2d 665 (6th Cir. 1977) ("The jury is entitled to know the 'setting' of a case. It cannot be expected to make its decision in a void without knowledge of the time, place and circumstances of the acts which form the basis of the charge.").

Title 18 U.S.C. § 921(21) defines § 922(a)(1)(B)'s phrase, "engaged in the business of[,]" as it applies to a manufacturer of ammunition. A manufacturer of ammunition is "engaged in the business" if the person "devotes time, attention, and labor to manufacturing ammunition as a regular course of trade or business with the principal objective of livelihood and profit through

the sale or distribution of the ammunition manufactured[.]" The phrase "with the principal objective of livelihood and profit" is defined by 18 U.S.C. § 921(22) to mean "that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection."[6] Much of the interpretive caselaw addresses this language in the context of a charge of dealing in firearms without a license under § 922(a)(1)(A), but the interpretive principles are equally applicable to a § 922(1)(1)(B) violation.

Courts that have interpreted the "engaged in the business of" language hold that it is a test of overall circumstances The defendant's sales activities must be shown to be something more than a hobby or the liquidation of a personal collection. The Third Circuit explained the relevant inquiry in *U.S. v. Palmieri*, 21 F.3d 1265, 1268 (3d Cir. 1994), *reversed and remanded on unrelated grounds*, 513 U.S. 957, 115 S.Ct. 413, 130 L.Ed.2d 329 (1994)):

> In determining whether one is engaged in the business of dealing in firearms, the finder of fact must examine the intent of the actor and all circumstances surrounding the acts alleged to constitute engaging in business. This inquiry is not limited to the number of weapons sold or the timing of the sales. For example, the location of the sales, the price charged for and characteristics of the firearms sold, and the intent of the seller are all potentially relevant.

In determining whether the personal collection or hobby exception applies, "there is no bright line rule. The fact-finder must determine whether the transactions constitute hobby-related sales or engagement in the business of dealing from the nature of the sales and in light of their circumstances." *Id.* at 1269. Repeat sales, including to the same customers, are key facts demonstrating that the defendant, rather than being a mere hobbyist or collector, was "engaging in the business" of dealing firearms or manufacturing ammunition. *See, e.g.*, *U.S. v. Shipley*, 546

---

[6] This section speaks of firearms, but appears intended to apply also to ammunition since it defines a common phrase applied in the immediately preceding paragraph to both firearms and ammunition.

Fed. Appx. 450, 456 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 2842, 189 L. Ed. 2d 810 (2014).[7]

In a case alleging that the defendant engaged in the business of manufacturing ammunition, there can be no more relevant evidence than proof that he engaged in repetitive sales of ammunition. That critical probative value is even more enhanced when the repeat sales were conducted to the same customer and in multiple locations and types of locations, such as sales occurring in different states and in both gun show and private residential contexts. Haig's repeat sales to Stephen Paddock demonstrate all of those things and therefore constitute powerful evidence that Haig, rather than carrying on "a strong hobby" as he described it to media outlets, was "engaged in the business" as that term and its parts are defined in 18 U.S.C. § 921(21) and (22). Haig sold ammunition to Paddock on at least two occasions, once at a gun show in Las Vegas, Nevada, and once at Haig's home in Arizona. It is the government's very high burden to prove beyond a reasonable doubt that Haig was engaged in the business of manufacturing ammunition. Each and every sale to each and every customer becomes critically important to the government meeting its burden

Haig's sales to Paddock bear a critical and unique probative value above and beyond his sales to any other customers: there is forensic toolmark evidence for these sales, which shows that Haig was actually selling the ammunition that he manufactured, rather than merely reselling ammunition manufactured by others. Section 921(21) also imposes on the government the burden to prove that the defendant engaged in the "sale or distribution of *the ammunition manufactured*" (emphasis added). In other words, it is not sufficient to prove that the defendant

---

[7] ("Although it may be true that there is a degree of ambiguity in locating precisely the border between, on the one hand, an unlicensed dealer that unlawfully engages in the regular business of dealing firearms and, on the other hand, an unlicensed hobbyist that lawfully engages in periodic sales, the jury here found Shipley guilty of making, over a number of years, numerous repetitive sales in quick succession, sometimes to repeat customers, and such conduct is unquestionably prohibited by the statutes' text.").

sold or distributed *some* ammunition, the government must prove that the defendant sold the ammunition manufactured in the course of his illegal business. In light of that requirement, there is no evidence in the case more probative than Haig's ammunition sales to Stephen Paddock and the subsequent recovery and forensic examination of ammunition found in Paddock's Mandalay Bay suite. The toolmarks on that ammunition match the reloading press assembly line set up in Haig's residence. There is no other evidence in the case that will so powerfully demonstrate these elements of a 922(a)(1)(B) charge. Finally, as will be explained below, Haig's lies about his ammunition manufacturing business, key evidence of 922(a)(1)(B)'s willfulness element, are only demonstrated through this evidence about the sales to Paddock, Haig's statements about Paddock, and the forensic matching of the manufacturing toolmarks on Paddock's ammunition to Haig's reloading equipment.

> ### (ii) Haig's Sale of Ammunition to Paddock is Necessary to Contextualize Haig's Lies to Law Enforcement and the Media About Whether He Sold Reloaded Ammunition or Armor Piercing and Incendiary Ammunition—Those Lies are Critical Evidence Demonstrating that Haig's Mental State Meets Section 922(a)(1)(B)'s Willfulness Element

A critical challenge in proving the charge of engaging in the business of selling ammunition without a license is to prove that the defendant acted willfully, i.e., he knew that his conduct was unlawful. The Ninth Circuit has recognized the difficulty of proving the willfulness element, including in prosecution of firearms offenses. *See United States v. Hernandez*, 859 F.3d 817, 824 (9th Cir. 2017).[8] A defendant's lies about or false characterizations of their conduct in relation to the sale or possession of firearms constitutes strong evidence of Section 922's

---

[8] ("This is not to suggest that the government is not permitted to prove willfulness by circumstantial evidence, including evidence of other bad acts or crimes under Rule 404(b) of the Federal Rules of Evidence. Indeed, the government may, and doubtless will, do so in many cases because so rarely is there evidence of what a defendant thought at the moment he committed a criminal act; his intent must often be inferred from his surrounding conduct.").

willfulness element. *See, e.g.*, *United States v. Tyson*, 653 F.3d 192, 202–03 (3d Cir. 2011) ("The jury could reasonably conclude that by calling himself a 'collector,' and by describing his firearms as 'antiques,' Tyson crafted a falsehood with the statute's exemptions in mind. Such behavior betrays knowledge of unlawful conduct."); *United States v. Lipp*, 533 F. App'x 418, 422–23 (5th Cir. 2013) ("Evidence that Lipp denied being under indictment came from Deputy Castillo, who asked Lipp …whether he had ever been charged with a felony or been contacted by law enforcement, and Lipp answered, 'No.' Such dissembling could be the basis for jurors to infer he knew it was illegal for him to have this firearm."). The court also considers lies and false statements as evidence of the willfulness element in non-firearms cases. For instance, in assessing willfulness in the tax evasion context, the Ninth Circuit has "held that evidence of attempts to conceal pertinent information can be treated as circumstantial evidence that a defendant knew he or she was violating the law." *United States v. Tipton*, 56 F.3d 1009, 1013 (9th Cir. 1995), *as amended on denial of reh'g* (July 21, 1995) (citing *United States v. Marabelles*, 724 F.2d 1374, 1379–80 (9th Cir. 1984)); *see also id.* (noting *Marabelles* held "fact that defendant lied to IRS agents about his tax record-keeping was evidence that he willfully attempted to evade taxes[.]").

As soon as Haig came into contact with law enforcement and was asked about Paddock, he started lying about the types of ammunition he sold, whether he sold reloaded ammunition, and other details of his ammunition manufacturing business. He continued those lies in subsequent law enforcement interviews and in media appearances where he identified himself as having only sold "tracer ammunition" to Paddock on a single occasion as part of his "strong hobby" of ammunition sales. The full context and details of Haig's statements are inextricably intertwined with the investigation into his interaction with Paddock and also with the firearms evidence recovered from Paddock's suite. Even more critical, however, is that Haig's statements are demonstrated to be lies based on the physical collection and forensic investigation of the

firearms evidence in Paddock's Mandalay Bay suite.

*Haig's False Statements to Law Enforcement on October 2-3, 2017 Regarding His Ammunition Sales to Paddock*

During the FBI/ATF's first interview of Haig on October 2, 2017,[9] he stated that he sold Paddock 600 rounds of .308 caliber tracer ammunition and some amount of .223 tracer ammunition after meeting Paddock at a Phoenix gun show. When asked where he sourced the ammunition that he sold to Paddock, Haig stated that the ammunition was manufactured by Lake City Army Ammunition Plant (Lake City).[10] Haig stated that Lake City often sells ammunition to the public as part of an inventory "overrun." Haig indicated that he buys the "overrun" ammunition in bulk from places like J&G Sales in Prescott, Arizona. Haig agreed to provide photos of the type of ammunition he sold to Paddock.

During this first interview, agents asked Haig if he manufactured the ammunition that he sold. Haig stated that he did not manufacture the ammunition that he sold. He went on to state that his customers often think he does manufacture the ammunition and he does not correct them. Haig explained that he believed allowing people to think that he manufactured the ammunition helped increase his sales.

Haig was interviewed a second time on October 2, 2017. He presented samples of the ammunition he purported to have sold to Paddock. The agents photographed the ammunition and observed that the ammunition's cartridge cases bore the Lake City headstamp. The ammunition presented by Haig was tracer ammunition, not armor piercing or incendiary ammunition. Haig repeated the claim that he sources his ammunition from Lake City overruns.

Haig was specifically asked if he makes his own ammunition. Haig stated that he does so,

---

[9] This interview occurred at Haig's place of work. Haig's coworker/associate, A.F., was present for this first meeting.
[10] Previously fired Lake City cartridge cases are frequently used to manufacture ammunition on a reloading press due to their high quality and ability to be reloaded into a new finished piece of ammunition multiple times.

11

but only for personal use. Haig was also asked if there was the possibility that his personally manufactured ammunition could be sold to a customer. He stated that would "never happen." Haig explained that he does not have the liability insurance to cover him in the event one of his personally made cartridges malfunctioned, resulting in damage to a firearm or injury to the end user. Haig also stated that his reputation for having quality ammunition was too valuable to jeopardize by selling personally manufactured ammunition. He also stated that he keeps his personal ammunition separate from the ammunition he sells so there is no mixing of the two. Haig specifically denied that any of the ammunition found at the Route 91 scene would match his reloading press.

On October 3, 2017, Haig called an ATF agent and advised that he and A.F. were talking and they were confident that they sold some ammunition to Paddock at a Las Vegas gun show. Haig stated that he recalled selling Paddock 30-40 rounds of .308 tracer ammunition.

*Haig's False Statements to Media Outlets About His Sales of Ammunition to Paddock and His Ammunition Business as it relates to Paddock* [11]

In a sitdown interview with ABC15 Arizona at which his attorney was present,[12] Haig described his sale of "tracer ammunition" to Paddock. Haig was careful to conspicuously describe the ammunition sold to Paddock as "surplus military" ammunition, i.e., ammunition that was not reloaded: "I sold him 600 rounds of .308 tracer, *surplus military*. I sold him 125 rounds of 5.56 tracer, *again, surplus U.S. military*. Put it in a box for him. He paid me, put it in his car and left."

---

[11] This section discusses false statements Haig made to various media outlets during press conferences and interviews. Haig was accompanied by his defense counsel during these press events and the attorney at times made factual assertions that appear to have been relayed to him by Haig. Some of these factual assertions were false based on later forensic results and other investigation. It is important to note that the defense attorney was not in a position to know that Haig's statements to him or the media were false, and these press events preceded key forensic findings and public disclosure of investigative details. It seems clear that the attorney was acting ethically in performing his responsibilities as Haig's advocate and never knowingly sought to mislead the press or interviewers.

[12] This video has been produced in discovery and remains available on the news outlet's Facebook page. *See* https://www.facebook.com/ABC15/videos/douglas-haig-interview/10155550027241359/ (accessed January 18, 2019).

(emphasis added).[13] At another point in the conversation, at the interviewer's request, Haig gave an extended discussion of what tracer ammunition is, how it is used militarily and recreationally, and that it was not unusual for a person to want to buy 600 rounds of tracer ammunition as Paddock had. Haig told the interviewer that a person can go into most of the sporting and gun shops in the area and "buy this kind of ammunition."

Haig characterized the sale of "tracer ammunition" to Paddock as occurring two or three weeks before the October 1 shooting. Haig claimed that he knew Paddock did not use the ammunition purchased from him because tracer ammunition would have been detrimental to Paddock's plan since it would identify his shooting position to law enforcement: "I don't even know why he bought it because tracer ammunition, what a lot of people don't know, that flare works both ways. Everybody could have seen where the shots were being fired from. It's like a red line, right back to where the shots are coming from."

Haig and his attorney also gave a press conference on February 2, 2018 where they discussed and took questions regarding the sale to Paddock and its relation to the nature of Haig's ammunition selling business.[14] With Haig standing inches away, the attorney described Haig as being engaged in "the ammunition resale business, part time, [since] back in 1991, *mostly as a hobby*" (emphasis added). The attorney characterized Haig's sale of ammunition to Paddock as consisting of a single instance of selling "720 rounds of tracer ammunition to Mr. Paddock. *That ammunition was not modified in any way whatsoever from the manufacturer's specs.*" (emphasis added). He further described the sale of ammunition to Paddock as "a *routine* transaction to purchase a

---

[13] It was public knowledge at this point that the box with Haig's address and ammunition with his fingerprints had been found in Paddock's suite.

[14] This video has also been produced in discovery and is available in two parts on YouTube at https://www.youtube.com/watch?v=KpvtBTBhySI (accessed January 18, 2019) and https://www.youtube.com/watch?v=EEDJNjGKIds (accessed January 18, 2019).

*routine* type of ammunition that is available in many different retail outlets throughout the state of Arizona." The attorney asserted that Haig "answered all of [the FBI/ATF agents'] questions truthfully and he actually offered some samples of *the exact type of ammunition that he sold to Mr. Paddock.*" (emphasis added). The attorney also claimed that Haig and Paddock "had one transaction and one transaction only[.]"[15]

When a reporter asked Haig if Paddock's ammunition purchase was special in nature, Haig said, "No, no. What he bought was *surplus* U.S. military tracer ammunition. Six hundred rounds 7.62 NATO M62, manufactured by Lake City. One hundred twenty rounds of 5.56 M196, uh, *manufactured by Lake City*, in the original packaging." (emphasis added). In response to another reporter's question, Haig stated that he knew his ammunition was not fired during the shooting because he had sold "tracer ammunition" which is highly visible when fired and "red streaks" would have been seen coming from the window of Paddock's suite.

### *The Investigation of Paddock's Firearms and Ammunition Demonstrate that Haig Lied During His Interviews with Law Enforcement and the Media*

As the ATF and FBI continued to investigate the firearms evidence from Paddock's suite, it became apparent that Haig had lied to them about multiple material aspects of his sales to Paddock and his ammunition business as it related to Paddock. The false nature of these statements was principally determined by the forensic examination of the ammunition recovered from five rifles and a magazine found in Paddock's suite. And additional investigation showed

---

[15] The Federal Rules of Evidence attribute the attorney's statements to Haig as direct and adoptive admission by a party-opponent. As Haig's agent, the attorney's statements are attributable to Haig under Rule 801(d)(2)(C)-(D) (excluding from the hearsay rule statements that are "offered against an opposing party and:...(C) [] made by a person whom the party authorized to make a statement on the subject; [or] (D) [] made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]" The context and nature of the press conference clearly establish that the attorney's statements are Haig's statements as adoptive admissions. *See id.* at (d)(2)(B) (excluding from the hearsay rule statements in which a "party manifested that it adopted or believed to be true[.]")

14

that Haig had repeatedly lied about the type of ammunition he sold and other details of his ammunition business.

First, when discussing the sales to Paddock, Haig lied when he told the FBI/ATF agents that he only sold "overruns" of ammunition from Lake City and did not sell his own reloaded ammunition to customers. Armor piercing ammunition found in two of Paddock's rifles, a Lewis Machine & Tool AR-10 rifle with telescopic scope and bipod and a Sig Sauer AR-10 rifle with red-dot scope and bipod, were forensically matched to one of the reloading presses seized from Haig's residence. Incendiary ammunition found in Paddock's Ruger brand AR-10 rifle was also forensically matched to the same reloading press seized from Haig's residence. One of the armor piercing cartridges in that firearm also contained Haig's fingerprint. Likewise, incendiary ammunition found in Paddock's Ruger brand bolt-action rifle (7.62 x 51mm/.308 caliber) with telescopic scope was also forensically matched to the same reloading press seized from Haig's residence. A fifth rifle used by Paddock, a POF USA brand AR-10 with scope and bipod, also contained armor piercing ammunition forensically matched to the same reloading press seized from Haig's residence. Finally, a Magpul brand magazine recovered from Paddock's suite contained armor piercing 7.62 x 51mm/.308 caliber ammunition forensically matched to the same reloading press seized from Haig's residence. Haig's fingerprints were recovered from two of the cartridges found inside this magazine. This forensic examination of the firearms evidence seized from Paddock's suite irrefutably demonstrates that Haig lied to the agents when he denied selling ammunition manufactured on his reloading press. Finally, further demonstrating Haig's false statements, an official from the company that owns the Lake City ammunition plant will testify at trial that Lake City did not manufacture the type of ammunition that Haig sold to Paddock.

Next, Haig lied to the FBI/ATF agents when he claimed that he sold Paddock "tracer

15

ammunition." As discussed above, the ammunition recovered from the five rifles and the magazine in Paddock's suite was not tracer ammunition. It was forensically determined to be either armor piercing or frangible incendiary ammunition, and it was forensically matched to Haig's reloading press.[16] Moreover, Haig went out of his way to present the agents with what he falsely claimed were samples of the tracer ammunition he claimed to have sold Paddock. Thus, the examination of the firearms evidence from Paddock's suite demonstrates another significant and material lie that Haig told about his ammunition business in relation to Paddock.

In interacting with the media, Haig repeated many of these same lies. He lied about the ammunition sold to Paddock as being "surplus U.S. military" when in fact the firearms toolmark examination showed that it had been manufactured on Haig's reloading press. He gave lengthy false descriptions of selling "tracer ammunition" to Paddock, not armor piercing or incendiary ammunition. He assured the media that the ammunition was "routine," widely available in stores, and was "not modified" in any way from the original "manufacturer's specs." These statements were false. Armor piercing ammunition, in fact, is not available to the public in stores, and its manufacture, sale, and distribution is highly regulated so that it is not available to the general public. *See, e.g.*, 18 U.S.C. § 922(a)(7)-(8) (establishing criminal penalties for the sale, delivery, or importation of armor piercing ammunition outside government channels and for export). Similarly, incendiary ammunition is not widely available in stores. Haig also lied about offering law enforcement samples of the "exact type of ammunition" sold to Paddock. The samples Haig provided were tracer ammunition, not his self-manufactured armor piercing or incendiary rounds actually sold to Paddock.[17] Finally, he lied about engaging in only "one

---

[16] Pieces of Paddock and Haig's ammunition were subjected to metallurgical analysis, x-ray analysis, disassembly, and test firing. The armor piercing ammunition Haig sold to Paddock contained steel core or steel ball penetrators designed to penetrate armor.

[17] Even Haig's statements about tracer ammunition were lies. The search warrant revealed that Haig was

transaction" with Paddock when in fact he sold Paddock ammunition multiple times and in two different states.

Haig was also dishonest with the media when, in the context of discussing the sales to Paddock, he characterized his ammunition business as a "hobby." During the ABC15 Arizona sit-down interview, the interviewer asked Haig how long he had been selling ammunition. Haig responded by stating: "It's a hobby. It's a hobby. It's interested me…I've…been doing it as a, uh, strong hobby since 1991." During the February 2, 2018 press conference, a reporter asked if Haig's ammunition business was "a side job." Haig told the reporter, "It's a hobby. It's a hobby." The investigation, including the search warrant executed on Haig's residence, revealed this statement to be a lie. Haig operated his business, Specialized Military Ammunition (SMA), through an Arizona Limited Liability Company registered with the Arizona Secretary of State. Haig's manufacturing business operated as any other business. He maintained a website where customers could submit orders for armor piercing, armor piercing incendiary, and high explosive armor piercing incendiary ammunition. He used business cards to advertise SMA's business and products. He included those cards and trade dress in the ammunition that he sold or shipped to his customers, including Paddock. He maintained sales invoices and receipts on business records marked with SMA's logo and trade dress. He priced his products for individual sale and had at his residence extensive inventory pre-marked for shipment or sale at the time of the search warrant. Haig also maintained additional written records and notes showing orders and shipments of ammunition. This "strong hobby" lie told to the media while discussing Paddock is quintessential evidence of willfulness because it demonstrates that Haig was aware that the licensing requirement applied to individuals who manufactured ammunition as something other

manufacturing tracer ammunition as well as armor piercing and incendiary ammunition.

than a hobby. *See, e.g.*, *Tyson*, *supra*.

These many lies to law enforcement and the media in the context of discussing the sales to Paddock constitute highly probative evidence demonstrating that Haig knew he was engaging in an unlawful business. This critical evidence of Haig's mental state and willful violation of the law should not be excluded. To do so would unfairly impair the government's case-in-chief and deprive it of uniquely powerful evidence that Haig violated Section 922(1)(1)(B) through operation of his illegal ammunition manufacturing business.

    **(iii) Haig's Media Statements About Paddock Also Provide Critical Evidence of His Pursuit of Ammunition Manufacturing as a Business, Rather than a Hobby, and His Willfulness Based on Statements that He was Familiar with the Law Regarding Ammunition Sales**

The full context of a defendant's statements regarding the scope of his firearms dealing activity is important to enable the government to demonstrate that the defendant was actually engaging in the business without a license rather than acting as a mere hobbyist or collector liquidating a collection. *Cf., e.g.*, *United States v. Masters*, 622 F.2d 83, 87-88 (4th Cir. 1980).[18] When being interviewed by the media about the sales to Paddock, Haig made several damaging admissions demonstrating that: (1) his repetitive sales of ammunition constituted more than a hobby; and (2) he was familiar with the laws regarding ammunition sales.

During the ABC15 Arizona sit-down interview, Haig stated that it was "not really" a nerve-wracking experience when the FBI contacted him about Paddock. He explained that he "figured something happened with something I sold, and they wanted to find out what I knew about the person, and that's pretty much what it was." This statement about Paddock

---

[18] (in unlicensed dealing case, affirming district court finding that government entitled to introduce entire statements of the defendant, including uncharged and other crimes because it allowed government to "'complete the story of the crime on trial by proving its immediate context of happenings near in time and place[,]'" and "evidence could not be 'fragmentized' without distorting or impairing the Government's proof of the crime.").

demonstrates that Haig sold enough ammunition to enough people that he was not surprised when the FBI and ATF contacted him about a criminal investigation, which he quickly assumed involved one of his ammunition sales. This demonstrates that Haig sold to many people, and thus is highly probative evidence that his ammunition manufacturing and sales constituted something more than a hobby due to the volume of repeat sales.

Immediately after that statement about Paddock and without another question being posed, Haig went into discussing his extensive experience with different kinds of customers. He did this in the context of juxtaposing Paddock's lack of any warning signs with his experience refusing to sell to some customers:

> So, *I've seen all kinds of people*. I will admit…he [Paddock]…there were no tells…there…some people, you just get a feeling or a vibe, or they say something, or they ask the wrong question, and, "Nope, sorry, not going to sell it to you. I don't like what I think you're going to do with this." Just refuse service…*Oh, yeah, all the time*."
> (emphasis added).

The interviewer asked Haig how many times he has refused to sell ammunition to a buyer. His response was: "On a weekend? At a gun show? probably four or five times." These statements made in the context of discussing the sales to Paddock and the absence of any warning signs given off by Paddock constitute damaging admissions that Haig had sold ammunition to so many different types of people (or refused to sell to them) that he was studied in reading customers. This vast experience with the ammunition business and potential customers is powerful evidence that Haig was engaged in a business, not "a strong hobby."

Haig's statements about Paddock also demonstrated that he had sold to enough people while carrying on the business that he knew whether the amount of ammunition Paddock purchased was common or unusual for ammunition sales. During the ABC15 Arizona interview, Haig stated that it was not unusual for a person to want to buy 600 rounds of "tracer ammunition"

as Paddock had. Similarly, in the February 2 press conference, Haig was asked if it was common for a person to buy from him the amount of ammunition that Paddock purchased, 720 rounds. Haig responded that it was, "Very common. Very common." These statements about the sales to Paddock constitute highly probative evidence establishing Haig's familiarity with the ammunition business and market/customer demand. Again, this distinguishes his conduct as a business, not "a strong hobby."

During his media appearances, Haig was asked questions about the legality of his conduct in selling tracer ammunition to Paddock. Haig was asked by a reporter to explain the legalities of ammunition sales. Haig told the reporter that there was no federal or state law prohibiting the sale of tracer ammunition. When discussing the absence of warning signs with Paddock and his frequent refusal to sell to suspicious customers, Haig explained that he was familiar with legal limitations on the sale of ammunition and demonstrated his knowledge of different ammunition laws:

> Interviewer: What did you think [when refusing to sell ammunition to some customers], they had a bad intent, or they were going to smuggle it across the border to Mexico, or like…?
>
> Haig: It could be anything, um, people coming over from California wantin' to buy tracer. Tracer is illegal in California. 'Sorry, not gonna sell it to you.' So, even though it's perfectly legal for them to buy it here, I don't want to be associated with anything they get in trouble for in their own state."

This statement about his business and Paddock then constitutes evidence that Haig was generally aware of laws governing the sale of ammunition. *Cf., e.g.*, *United States v. Simmons*, 163 F. App'x 403, 406 (7th Cir. 2006) (among other factors showing sufficient evidence of defendant's willfulness were his "statements about gun shows … illustrating his awareness of exceptions in current gun licensing and sale laws."). A jury can use this evidence of Haig's familiarity with ammunition laws to infer that he acted willfully in disregarding the prohibition on engaging in

the business of manufacturing ammunition without a license. All of the foregoing statements made in the context of Haig discussing the sales to Paddock are highly probative evidence establishing his commission of Section 922(a)(1)(B)'s *actus reus* and *mens rea*.

> **(iv) Paddock's Purchase of Armor Piercing and Incendiary Ammunition from Haig is Highly Probative of Haig Operating an Illegal Ammunition Manufacturing Business – Paddock Had a Specific Objective to Obtain Ammunition with Armor Piercing and Incendiary Capability, and Haig Marketed Precisely that Type of Ammunition on the Internet and at Gun Shows**

Prior to taking it down after the October 1 shooting, Haig's SMA website advertised the availability of high explosive armor piercing incendiary ammunition, armor piercing incendiary ammunition, and armor piercing ammunition. Haig also routinely sold this type of ammunition at gun shows. The investigation of Paddock's shooting documented that Paddock planned and attempted to use gunfire to breach and explode fuel tanks connected to McCarran International Airport. Based on that plan, Paddock had a reason to seek out armor piercing and incendiary ammunition, not tracer ammunition. Paddock went out of his way to make contact with Haig both in Nevada and Arizona to obtain ammunition. This aspect of Paddock's conduct and the shooting therefore has strong probative value in showing that Haig was known as a supplier and marketer of armor piercing and incendiary ammunition, not the more commonplace and easily obtainable tracer ammunition. That Paddock would ultimately get his armor piercing and incendiary ammunition from Haig demonstrates that Haig was engaged in a business of manufacturing ammunition, not "a strong hobby."[19]

*/ / /*

---

[19] It is worth noting that, if Paddock was attempting to obtain only tracer ammunition, he would have no reason to go to such lengths to buy ammunition from Haig. Haig and his attorney have emphasized the wide availability of tracer ammunition in sporting and gun stores. If that is the case, Paddock would have been able to purchase his ammunition from one of those many stores, including in Nevada where the state firearms laws are not so different than Arizona's.

1
2

**(v) Haig's Sale of Ammunition to Paddock and the Recovery of that Ammunition in Las Vegas is Essential to Countering a Venue Defense and Permitting the Government to Meet Its Burden at Trial**

3
4

Venue is an element of the government's case in a criminal prosecution. *United States v.*

5

*Buckhanon*, 505 F.2d 1079, 1083 (8th Cir.1974). And the government must prove at trial by a

6

preponderance of the evidence that venue is proper. *United States v. Grammatikos*, 633 F.2d 1013,

7

1022 (2d Cir. 1980). The Ninth Circuit holds that venue is an issue to be determined by the jury

8

at trial. *United States v. Lukashov*, 694 F.3d 1107, 1120 (9th Cir. 2012). Haig has unsuccessfully

9

challenged venue on a pretrial basis. ECF No. 23; 36. He is therefore likely to again challenge

10

venue at trial and request that the jury be instructed on the issue. He likely will also renew his

11

venue challenge through a Rule 29 motion at the conclusion of the government's case-in-chief.

12

The evidence of Haig traveling to Las Vegas, Nevada and selling ammunition to Paddock at a

13

gun show, and the recovery of that ammunition in Paddock's suite in Nevada is critical evidence

14

to proving proper venue. Likewise, Paddock's conduct of flying to Arizona where he purchased

15

ammunition from Haig and then drove it back to Nevada is also key venue evidence. Haig's

16

attack on the venue for this prosecution is another reason why evidence of the Paddock sales and

17

recovery of the firearms evidence from Paddock's suite is probative and highly relevant to a fact

18

of consequence at trial. It would be a perverse outcome if Haig obtained this dramatically

19

overbroad suppression of core probative evidence collected in the District of Nevada and then

20

sought to attack venue at trial, claiming his criminal activity only took place in another federal

21

district.[20]

22

/ / /

23
24

---

[20] For the many reasons already stated, and because Haig's sales to Paddock are direct evidence of his commission of the charged crime, the evidence would still need to be presented even if Haig elected to waive any alleged venue challenges.

22

**C.** **There Are Many Details About the October 1 Shooting and Paddock that the Government Has No Plans to Present at Haig's Trial**

While Haig's ammunition sales to Paddock, statements about those sales, the recovery of that ammunition, and the resulting forensic analysis are an essential, core part of its case-in-chief, the government has no plan to introduce many of details from the investigation of Paddock and his attack. Unless Haig makes them relevant during the course of the trial through certain defenses or opening the door to particular topics, the government has no intention to present in its case-in-chief many of the details about the investigation of Paddock and the October 1 shooting. The government has no intention to present evidence of the following matters:

- Evidence relating to any shooting victims or the Route 91 concert venue crime scene;

- Photographs or video of Stephen Paddock in any state or place, before or after the shooting;

- Photographs or descriptions of Paddock's suite that do not relate to recovery of the ammunition later identified as matching Haig's reloading press;

- Photographs or descriptions of Paddock's firearms and ammunition that are not connected to Haig's ammunition business;

- Portions of Haig's media statements that do not relate to his ammunition sales to Paddock or statements about his ammunition business; and

- Portions of Haig's statements that relate to the casualties inflicted during the October 1 shooting, or that otherwise relate details not involving his sale of ammunition to Paddock and his operation of the ammunition manufacturing business;

Finally, while it does not appear to be strictly required under the law or the facts of this case, the

government does not object to fashioning a limiting instruction in cooperation with the defense, which would admonish the jury regarding the purposes for which it may consider Haig's sale of ammunition to Paddock and the evidence recovered from Paddock's suite. Those steps are more than sufficient to ensure that the government is able to present this critical evidence while also eliminating any risk of unfair prejudice to Haig.

### III.   Conclusion

WHEREFORE, after consideration of the included facts, points, authorities, exhibits, and arguments, the United States respectfully requests that this Court DENY Haig's "Motion to Preclude Irrelevant and Unduly Prejudicial Evidence." ECF No. 40.

DATED this 22nd day of January, 2019.

Respectfully submitted,

NICHOLAS A. TRUTANICH
United States Attorney

//s// Patrick Burns
_____
PATRICK BURNS
CRISTINA D. SILVA
NICHOLAS D. DICKINSON
Assistant United States Attorneys

1

2

**CERTIFICATE OF SERVICE**

I certify that I am an employee of the United States Attorney's Office. A copy of the foregoing **GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S "MOTION TO PRECLUDE IRRELEVANT AND UNDULY PREJUDICIAL EVIDENCE" [ECF No. 40]** was served upon counsel of record, via Electronic Case Filing (ECF).

DATED: this 22nd day of January, 2019.

                              //s// Patrick Burns
                              _____
                              PATRICK BURNS
                              Assistant United States Attorney

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24