UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:18-CR-256 JCM (VCF) |
| Plaintiff(s), | ORDER |
| v. | |
| DOUGLAS HAIG, | |
| Defendant(s). | |

Presently before the court is defendant Douglas Haig's motion to transfer venue to the Northern Division of the District of Nevada or, the alternative, select a districtwide jury. (ECF No. 96). Plaintiff United States of America ("the government") filed a response (ECF No. 105), to which Haig replied (ECF No. 108).

Also before the court is the government's motion *in limine*. (ECF No. 98). Haig filed a non-opposition response. (ECF No. 100).

Also before the court is Haig's motion for reconsideration. (ECF No. 99). The government filed a response (ECF No 106), to which Haig replied (ECF No. 107).

Also before the court is the government's motion for leave to file surreply. (ECF No. 109).

**I.     Facts**

This action arises from the investigation into the October 1, 2017, mass shooting, where Stephen Paddock opened fire on a crowd of over 22,000 concertgoers at the Route 91 Harvest music festival on 3901 South Las Vegas Boulevard, Las Vegas, Nevada. (ECF No. 1).

On the evening of October 1, 2017, Paddock positioned himself in rooms 134 and 135 on the 32nd floor of the Mandalay Bay Resort and Casino, which were in an elevated position overlooking the concert venue. *Id*. Paddock brought with him a remarkable arsenal including over

twenty firearms, hundreds of rounds of ammunition (mostly in preloaded high-capacity magazines), and range finding devices. *Id*. At approximately 10:05 p.m., Paddock used these weapons to attack the concertgoers from his hotel rooms, killing fifty-eight and injuring 869 people.[1]

After obtaining and executing search warrants on Paddock's hotel rooms, law enforcement officials found Paddock's body, the weapons, and hundreds of rounds of spent ammunition. *Id*. The officers and agents also found an Amazon.com cardboard shipping box in the hotel rooms, marked with the name Douglas Haig and the address 4323 East Encanto Street, Mesa, Arizona. *Id*.

On October 2, 2017, and October 5, 2017, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") agents and Federal Bureau of Investigation ("FBI") agents arranged interviews with Douglas Haig and his business partner (hereinafter "Associate"). *Id*. Haig and Associate admitted that they had interacted with Paddock on multiple occasions. *Id*. Their first interaction with Paddock was on or about August 27, 2017, at a gun show in Las Vegas, Nevada. *Id*. Paddock browsed the ammunition samples at their booth and purchased forty to fifty rounds of .308 caliber incendiary ammunition. *Id*.

Haig and Associate's second interaction with Paddock was in early September 2017 at a gun show in Phoenix, Arizona. *Id*. Haig stated that Paddock attempted to purchase bulk ammunition and that they exchanged telephone numbers to coordinate a future transaction. *Id*.

Haig further stated that on September 19, 2017, he spoke with Paddock on the telephone and arranged to complete an ammunition purchase that day. *Id*. Paddock arrived at Haig's residence and purchased 600 rounds of .308 caliber (7.62mm) tracer ammunition as well as 120 rounds of M196 .223 caliber tracer ammunition. *Id*. According to Haig, he put the rounds in the Amazon.com shipping box, which law enforcement officials found in Paddock's hotel rooms. *Id*. Haig noted that Paddock purchased the munitions with cash and took the time to put on gloves prior to placing the box into the trunk of his vehicle. *Id*.

---

[1] LVMPD Criminal Investigative Report of the 1 October Mass Casualty Shooting, LVMPD Event No: 171001-3519.

The ATF and FBI agents asked Haig whether he manufactured the ammunition that he sold to Paddock. (ECF No. 42). Haig repeatedly claimed that Lake City Army Ammunition Plant manufactured the ammunition that he sold. *Id*. Haig also stated that he manufactures ammunition only for his personal use. *Id*

During these interviews, the agents observed reloading equipment in Haig's shop, which was in the backyard of his residence located at 4323 East Encanto Street, Mesa, Arizona. (ECF No. 1). Haig voluntarily provided the agents with a sample of ammunitions that he sells to customers and claimed that the ammunition from the Las Vegas crime scene would not have his toolmarks. *Id*.

FBI investigators subsequently forwarded evidence from the Las Vegas crime scene to a laboratory for forensic analysis. *Id*. The examination revealed that: (1) two rounds of unfired .308 caliber cartridges from Paddock's hotel rooms carried Haig's fingerprints; (2) the cartridges had reloading equipment toolmarks; and (3) the cartridges contained armor piercing/incendiary bullets. *Id*.

On October 19, 2017, the FBI obtained and executed a search warrant at Haig's residence. *Id*. Law enforcement officials seized over 100 items, including live ammunition, reloading equipment, and ammunition sales records. *Id*. Laboratory analysis confirmed that the ammunition from Haig's residence was reloaded armor piercing ammunition and contained toolmarks consistent with the marks on the reloaded armor piercing rounds from Paddock's hotel rooms. *Id*. Haig does not have a license to manufacture armor piercing ammunition. *Id*.

Analysis of the sales records revealed that Haig had engaged in over 100 sales of armor piercing ammunition throughout the country. *Id*. Three of these sales were with customers residing in Nevada. *Id*. Law enforcement officials interviewed these customers and discovered that two of the sales occurred in person at the Cashman Center in Las Vegas, Nevada. *Id*. The third sale was an online transaction and the ammunition was shipped to a residence in Elko, Nevada. *Id*.

James C. Mahan
U.S. District Judge

On August 22, 2018, a grand jury in the District of Nevada returned an indictment charging Haig with one count of engaging in the business of manufacturing ammunition without a license in violation of 18 U.S.C. §§ 922(a)(1)(B) and 924(a)(1)(D). (ECF No 10).

Throughout the investigation and the pending criminal proceeding, there has been publicity regarding Haig's involvement to the October 1, 2017, shooting. On multiple occasions Haig made various representations in the media regarding his business, Specialized Military Ammunition ("SMA"), which is an Arizona limited liability company. (ECF No. 42). Among these representations, Haig made statements regarding his awareness of laws governing the sale of ammunition and that he runs SMA as a "strong hobby" rather than a business. *Id*.

On September 5, 2018, Haig filed a motion to transfer venue to the District of Arizona arguing, in part, that he could not have a fair and impartial trial in the District of Nevada due to pretrial publicity. (ECF No. 18). The court denied Haig's motion and held that (1) the circumstances of this case do not rise to an extreme situation necessary to transfer venue due to pretrial publicity and (2) the vast jury pool and jury selection procedures will permit the court to seat an impartial jury. (ECF No. 36).

Now, Haig moves to transfer venue to the District of Nevada's Northern Division on the grounds that the court cannot seat a fair and impartial jury in the Southern Division of Nevada due to pretrial publicity. (ECF No. 96). Further, the government has filed a motion *in limine* and Haig has filed a motion for reconsideration. (ECF Nos. 98, 99).

**II. Legal Standard**

*a. Intra-district transfer of venue*

Federal Rule of Criminal Procedure 18 states that "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in the district where the offense was committed. The court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice." The government must file the action in the unofficial division of the court in which the offense was committed. LR IA 1-8(b). However, "the presiding judge may direct that proceedings or trial take place in the division other than the division where filed." LR IA 1-8(c).

In determining whether an intra-district transfer is appropriate, courts apply the standards set forth for venue transfer pursuant to Federal Rule of Criminal Procedure 21. *See*, *e.g.*, *United States v. Benzer*, No. 2:13-cr-00018-JCM-GWF, 2014 WL 7359078, at *6–14 (D. Nev. Dec. 24, 2014); *see also*, *e.g.*, *United States v. Lipscomb*, 299 F.3d 303, 340–48 (5th Cir. 2002); *see also*, *e.g.*, *Jones v. Gasch*, 404 F.2d 1231, 1233–43 (D.C. Cir. 1967); *see also*, *e.g.*, *United States v. Salad*, 915 F. Supp. 2d 755, 757 (E.D. Va. Nov. 21, 2012); *see also*, *e.g.*, *United States v. Bennett*, No. 12-20459, 2013 WL 4521103, at *5–9 (E.D. Mich. Aug. 27, 2013).

    *b. In limine*

"The court must decide any preliminary question about whether . . . evidence is admissible." Fed. R. Evid. 104. Motions *in limine* are procedural mechanisms by which the court can make evidentiary rulings in advance of trial, often to preclude the use of unfairly prejudicial evidence. *United States v. Heller*, 551 F.3d 1108, 1111–12 (9th Cir. 2009); *Brodit v. Cambra*, 350 F.3d 985, 1004–05 (9th Cir. 2003).

"Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1980). Motions *in limine* may be used to exclude or admit evidence in advance of trial. *See* Fed. R. Evid. 103; *United States v. Williams*, 939 F.2d 721, 723 (9th Cir. 1991) (affirming district court's ruling *in limine* that prosecution could admit impeachment evidence under Federal Rule of Evidence 609).

Judges have broad discretion when ruling on motions *in limine*. *See Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002); *see also Trevino v. Gates*, 99 F.3d 911, 922 (9th Cir. 1999) ("The district court has considerable latitude in performing a Rule 403 balancing test and we will uphold its decision absent clear abuse of discretion."). "[I]n limine rulings are not binding on the trial judge [who] may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000); *accord Luce*, 469 U.S. at 41 (noting that *in limine* rulings are always subject to change, especially if the evidence unfolds in an unanticipated manner).

James C. Mahan
U.S. District Judge

- 5 -

"Denial of a motion *in limine* does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded." *Conboy v. Wynn Las Vegas, LLC*, No. 2:11-cv-1649-JCM-CWH, 2013 WL 1701069, at *1 (D. Nev. Apr. 18, 2013).

  *c. Reconsideration*

A motion for reconsideration "should not be granted, absent highly unusual circumstances." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009). "Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *School Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

Reconsideration is "an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003) (internal quotations omitted). A motion for reconsideration is also an improper vehicle "to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in litigation." *Marlyn Nutraceuticals*, 571 F.3d at 880.

## III. Discussion

Three motions are pending before the court. First, the court will deny Haig's request to transfer venue because pretrial publicity does not preclude the court from seating a fair and impartial jury in the Southern Division of Nevada. Second, the court will deny Haig's request, in the alternative, to use a districtwide jury pool because the Southern Division of Nevada has over 1,750,000 prospective jurors.[2] Third, the court will grant the government's motion *in limine*. Fourth, the court will deny Haig's motion for reconsideration.

. . .

---

[2] The number of prospective jurors in the Southern Division of Nevada is based on figures that the United States Census Bureau estimated on July 1, 2018. The Census Bureau publishes these statistics at *https://www.census.gov/quickfacts/fact/table/nyecountynevada,lincolncountynevada,esmeraldacountynevada,clarkcountynevada/PST045218*.

*a. Divisional transfer of venue*

Haig requests that the court transfer venue from the Southern Division of Nevada to the Northern Division of Nevada for the limited purpose of conducting trial. (ECF No. 96). Haig contends that the court cannot seat a fair and impartial jury in the Southern Division of Nevada due to the pretrial publicity arising from the October 1, 2017, mass shooting. *Id*. Haig further argues that the court will be more likely to seat an impartial jury in the Northern Division of Nevada because the events of the October 1, 2017, mass shooting impacted prospective jurors in the Southern Division of Nevada to a greater extent than prospective jurors in the Northern Division of Nevada. *Id*.

Because Haig moves to transfer venue prior to jury selection, he must demonstrate presumed prejudice. *United States v. Collins*, 109 F.3d 1413, 1416 (9th Cir. 1997). A court may presume prejudice "when the record demonstrates that the community where the trial" is scheduled to be held is "saturated with prejudicial and inflammatory media publicity about the crime." *Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir. 2011) (citation omitted). The adverse publicity must be "so pervasive and inflammatory that the jurors cannot be believed when they assert that they can be impartial." *W.R. Grace*, 408 F. Supp. 2d at 1007 (citing *United States v. Croft*, 124 F.3d 1109, 1115 (9th Cir. 1997)).

On October 10, 2018, the court addressed Haig's concern regarding pretrial publicity and held that this case does not involve an extreme situation that warrants transferring venue because (1) Haig's purported manufacturing and sale of ammunition has not been the focal point of media attention, (2) Haig has taken it upon himself to publicly engage the media to advance his position, (3) the Southern Division of Nevada has a vast jury pool; and (4) available jury selection procedures will remedy any lingering prejudicial effect of pretrial publicity. *United States v. Haig*, No. 2:18-cr-256-JCM (VCF), 2018 WL 8646839 at *5–6 (D. Nev. Oct. 10, 2018).

The circumstances of this case have not changed since the court's October 10, 2018, order. Moreover, the October 1, 2017, mass shooting was an event of national significance that took place at an international tourist destination. Haig has not provided any concrete grounds showing that pretrial publicity of such an event affected prospective jurors in the Southern Division of Nevada

differently than prospective jurors in the Northern Division of Nevada. The court recognizes that the mass shooting may have directly impacted some individuals residing in the Southern Division of Nevada. However, jury selection procedures will allow the court to eliminate those individuals if they are unable to serve as fair and impartial jurors. Accordingly, the court will not transfer venue.

    *b. Districtwide jury pool*

Haig argues in the alternative that the court should select jurors from both divisions to "ensure that the jury pool is not solely relegated to those most impacted by Mr. Paddock's conduct on October 1, 2017[.]" (ECF No. 96). Haig's argument has two fundamental flaws. First, the Northern Division of Nevada was not shielded from pretrial publicity because the media coverage in this case pervaded throughout the nation. Second, the record does not indicate how many individuals residing in the Northern Division of Nevada attended, or had a close relative or friend attend, the Route 91 Harvest music festival.

The court is confident that the Southern Division of Nevada, which has a population of 2,283,020 with approximately 77% of them over the age of eighteen (18)[3], contains at least fourteen fair and impartial prospective jurors. In light of this vast jury pool, the court will deny Haig's motion.

    *c. In limine*

The government wishes to bifurcate Special Agent Chris McPeak's testimony so that McPeak may testify (1) at the beginning of the government's case-in-chief about the early events of the investigation which identified Haig as the manufacturer of ammunition and (2) at the end of the government's case-in-chief to present evidence recovered through search warrants and digital device review as well as various self-authenticating documents and business records. (ECF No. 98).

---

[3] United States Census Bureau estimated this figure on July 1, 2018. The Census Bureau publishes this statistic at *https://www.census.gov/quickfacts/fact/table/nyecountynevada,lincolncountynevada,esmeraldacountynevada,clarkcountynevada/PST045218*.

Federal Rule of Evidence 611 allows courts to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence[.]" The court does not object to the government's proposed mode of presentation as it would not waste time or otherwise frustrate the jury's role as the fact-finder. *See* Fed. R. Evid. 611(a)(1)-(2). Therefore, the court will grant the government's unopposed motion *in limine*.

### d. Reconsideration

In its July 8, 2019, order, the court held that the type of ammunition Haig manufactured and sold is relevant to the offense that Haig allegedly committed. (ECF No. 89). The decision was based on the circumstances of Haig's alleged business activities—he manufactured and sold armor piercing rounds for civilian use without a license. The court held that Haig's failure to obtain a license for his alleged business shows that he understood the illegal nature of his acts because there does not exist any federal license that authorizes the manufacture and sale of armor piercing ammunition for civilian use. *Id.*

Haig argues that the court committed clear error in its July 8, 2019, order because the court cited to 18 U.S.C. § 922(a)(7), which regulations manufacture or import of armor piercing ammunition, rather than 18 U.S.C. § 922(a)(8), which regulates the sale or delivery of armor piercing ammunition. (ECF No. 99).[4] The court acknowledges that it should have cited both statutes in the order. However, because a scrivener's error does not constitute clear error, the court will deny Haig's motion for reconsideration. *See, e.g.*, *Ross Dev. Corp. v. Fireman's Fund Ins. Co.*, No. CA 2:08-3672-MBS, 2012 WL 5831162, at *4 (D.S.C. 2012) (holding that a scrivener's error does not constitute clear error). The court will also amend its July 8, 2019, order contemporaneously with this order to ensure that the record is clear and complete.

. . .

. . .

. . .

---

[4] Haig improperly raises a new argument in his reply brief regarding the legality of Haig's conduct. The court will disregard this new argument and deny the government's motion for leave to file surreply. *JG v. Douglas Cnty. Sch. Dist.*, 552 F.3d 786, 803 n. 14 (9th Cir. 2008) (new evidence or arguments presented in a reply should not be considered without giving the non-movant an opportunity to respond).

## IV. Conclusion

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that Haig's motion to transfer venue or, in the alternative, select a districtwide jury (ECF No. 96) be, and the same hereby is, DENIED.

IT IS FURTHER ORDERED that the government's motion *in limine* (ECF No. 98) be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that Haig's motion for reconsideration (ECF No. 99) be, and the same hereby is, DENIED.

IT IS FURTHER ORDERED that the government's motion for leave to file surreply (ECF No. 109) be, and the same hereby is, DENIED.

DATED August 6, 2019.

_____
UNITED STATES DISTRICT JUDGE