NICHOLAS A. TRUTANICH
United States Attorney
District of Nevada
Nevada Bar No. 13644
PATRICK BURNS
Nevada Bar No. 11779
United States Attorney's Office, District of Nevada
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336/Fax: (702) 388-6418
John.P.Burns@usdoj.gov

*Representing the United States of America*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>    Plaintiff,<br><br>vs.<br><br>**DOUGLAS HAIG,**<br><br>    Defendant. | **CASE NO.:  2:18-CR-00256-JCM-VCF**<br><br>**GOVERNMENT'S SENTENCING MEMORANDUM** |

The United States of America, by and through NICHOLAS A. TRUTANICH, United States Attorney, and PATRICK BURNS, Assistant United States Attorney, hereby respectfully submits this Government's Sentencing Memorandum.

# **TABLE OF CONTENTS**

**I.  Relevant Procedural Background** ............................................................................. 1

**II. Argument** ..................................................................................................................... 3

    **A. Legal Standard for Determining an Appropriate Sentence** ................................. 3

    **B. The Sentencing Guidelines as Applied to Haig's Criminal Offense** ................... 4

        **1) The Presentence Investigation Report's Offense Level, Sentencing Range
        Calculation, and Recommendation** ............................................................... 4

        **2) Haig's Objections to the PSR** ...................................................................... 5

           **i.  Haig's Claim that His Offense Did Not Involve a Large Quantity
               of Armor Piercing Ammunition is Meritless and Belied by the
               Physical, Documentary, and Electronic Evidence** ............................... 5

               *Haig's Method of Producing Armor Piercing Ammunition Usable in
               Modern Assault Weapons* ...................................................................... 6

               *The Large Quantity of Armor Piercing Ammunition that Haig Sold* ...... 21

           **ii.  Haig Fails to Justify a Downward Departure Based on Extraordinary
               Family Circumstances** ......................................................................... 29

    **C.  Given the Nature and Circumstances of Haig's Crime, the Court Should Impose
      a 21-Month Prison Sentence** ............................................................................ 32

        **1) Nature and Circumstances of the Offense** ................................................. 32

           *The Route 91 Shooter's Use of Haig-Manufactured Ammunition During
           the October 1 Massacre* ......................................................................... 32

           *Haig's Manufacture and Widespread Marketing of Military-Style Armor Piercing
           Ammunition Useable in Modern Assault Weapons is Precisely the Type of Danger
           Congress Sought to Combat When Banning Such Ammunition* ............................38

        **2) History and Characteristics of the Defendant** ............................................ 42

        **3) Need to Reflect the Seriousness of the Offense and to Promote the Rule of Law** ....... 43

        **4) Need to Afford Adequate Deterrence** ........................................................ 44

        **5) Need to Avoid Unwarranted Sentencing Disparities** ................................. 45

**III. Conclusion** ................................................................................................................ 46

i

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Relevant Factual and Procedural Background

*Factual Background*

This case arises out of the investigation into the October 1, 2017 mass shooting committed at the Route 91 Harvest musical festival. In the Mandalay Bay hotel suites from which the shooter staged his attack, investigators located a box with a shipping label bearing Defendant Douglas Haig (Haig)'s name and Mesa, Arizona address.[1] Beginning on October 2, 2017, agents from the Federal Bureau of Investigation (FBI) and the Bureau of Alcohol Tobacco, Firearms and Explosives (ATF) began a series of interviews with Haig. Haig admitted to meeting the Route 91 shooter and selling him ammunition in both Las Vegas and Arizona on August 27 and September 19, 2017, respectively. Haig admitted to traveling to gun shows to sell ammunition. He admitted that he reloads ammunition, but claimed he did so for personal use only.[2] He denied selling reloaded ammunition. Haig denied that any of the ammunition recovered from the Route 91 crime scene would have reloading marks consistent with the reloading equipment at his home. ATF determined that Haig did not possess a federal firearms license of any type and was not authorized to manufacture and sell ammunition in any form.

A latent fingerprint examination revealed that Haig's fingerprints were on two pieces of 7.62x51mm NATO (.308) caliber ammunition removed from a magazine located in the shooter's hotel suite. A forensic firearms examination determined that those pieces of ammunition had toolmarks consistent with being reloaded, and were armor piercing and incendiary in nature.

---

[1] Mesa is a suburb twenty miles east of Phoenix.
[2] Reloading is the mechanical process of assembling the component parts of an ammunition cartridge (bullet (projectile), gunpowder, primer, and cartridge case) into a finished piece of ammunition that can be fired out of a firearm.

Investigators determined that Haig operated an ammunition business known as Specialized Military Ammunition (SMA). Haig used SMA to sell ammunition to customers in other states over the internet.[3] SMA advertised the sale of armor piercing (AP), armor piercing incendiary (API), and high explosive armor piercing incendiary ammunition (HEAPI).

On October 24, 2017, a search warrant was executed on Haig's residence. Agents seized hundreds of pounds of ammunition and ammunition components. Haig had ammunition or firearms-related equipment in virtually every room of the residence, and a workshop had been converted into a three-reloading press manufactory for ammunition. Haig was in the process of automating his reloading assembly line by adding computer equipment. Numerous packages of API, AP, HEAPI, and other types of ammunition were packaged for sale with price tags affixed to them. Some of these packages contained Haig's SMA business cards. Haig also had bags and boxes of projectiles for assembling AP, API, HEAPI, and tracer ammunition. Haig's residence contained professional-looking SMA invoice tablets reflecting ammunition sales and numerous records showing that he sold AP, API, and HEAPI to scores of customers throughout the United States in more than twenty states. Based on interviews and a review of those records, investigators identified four purchasers (besides the Route 91 shooter) to whom Haig had either shipped armor piercing ammunition to Nevada or made a sale at a Las Vegas gun show. The review showed that Haig had sold ammunition at Las Vegas gun shows in at least 2016 and 2017.

The reloading presses in Haig's residence were forensically examined and compared to ammunition recovered from both the October 1 crime scene and Haig's residence. As to the October 1 scene, the armor piercing ammunition with Haig's latent prints had reloading

---

[3] Haig registered this business as an Arizona Limited Liability Company.

toolmarks identified as being created by one of the reloading presses in Haig's residence. AP, API, and HEAPI ammunition loaded into five of the shooter's rifles had toolmarks identified as being created by that same reloading press. Armor piercing ammunition rounds recovered from Haig's workshop had reloading toolmarks identified as being made by the reloading press that made the ammunition in the shooter's rifles, as well as in four fully loaded magazines.[4]

*Procedural Background*

On August 22, 2018, a grand jury in the District of Nevada returned an indictment charging Haig with one count of Engaging in the Business of Manufacturing Ammunition Without a License (18 U.S.C. §§ 922(a)(1)(B); 924(a)(1)(D)). ECF No. 10. Haig pleaded guilty to the charge on November 19, 2019. ECF No. 118. The parties' plea agreement stipulates to a base offense level of 12, and permits the government to argue for: (1) a two-level upward adjustment due to obstruction of justice; and (2) a further two-level offense level increase based on either: (a) an upward departure due to Haig's offense involving a large quantity of armor piercing ammunition; or (b) as an upward variance based on the 3553(a) factors.  ECF No. 118. Haig is free to argue for any lawful variances or departures. *Id.* Sentencing is currently scheduled for March 16, 2020. The government now submits this sentencing memorandum to aid the Court's sentencing decision.[5]

## II.    Argument

### A. Legal Standard for Determining an Appropriate Sentence

While the Sentencing Guidelines are no longer mandatory, they continue to play a critical

---

[4] *See generally* Laboratory Report – Firearms/Toolmarks, July 5, 2018, attached here as Exhibit 1.
[5] The Local Rules do not specify a page limitation for sentencing memoranda. Assuming there was some page limit, good cause warrants permitting the government to file this 46-page brief. This is due to the complexity and gravity of the case, the technical nature of Haig's objections, the need for demonstrative excerption of evidentiary items throughout the brief, as well as the importance of laying a fulsome foundation for the sentences recommended by Probation and the government.

role in accomplishing the Sentencing Reform Act's goal of "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005); *see also United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46, 194 L. Ed. 2d 444 (2016) (quoting *Peugh v. United States*, 569 U.S. 530, 548, 133 S. Ct. 2072, 2087, 186 L. Ed. 2d 84 (2013) (internal quotation marks omitted)).

As the Court is aware, the framework for determining an appropriate sentence is set forth in 18 U.S.C.§ 3553(a), which requires that the Court ensure the sentence imposed properly considers, among other factors: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need to reflect the seriousness of the offense and promote respect for the law; (4) the need to afford adequate deterrence; and (5) the need to avoid unwarranted sentencing disparities. Post-*Booker*, the Ninth Circuit reviews a district court's sentencing decision to determine: (1) whether the district court properly calculated the applicable range under the advisory guidelines; and (2) whether the sentence imposed is reasonable. *United States v. Mohamed*, 459 F.3d 979, 985 (9th Cir. 2006) (citations omitted).

**B. The Sentencing Guidelines as Applied to Haig's Criminal Offense**

    **1) The Presentence Investigation Report's Offense Level, Sentencing Range Calculation, and Recommendation**

The Presentence Investigation Report (PSR) assesses Haig's base offense level as twelve

based on USSG § 2K2.1(a)(7). PSR ¶ 50. Because Haig obstructed justice in connection with the investigation of his crime, the PSR determines that USSG § 3C1.1's two-level upward adjustment applies for an adjusted offense level of fourteen. *Id.* at ¶ 54.[6] The PSR goes on to apply a two-level reduction in offense level for acceptance of responsibility under USSG § 3E1.1(a). *Id.* at 57. Haig's criminal history category is Category I. *Id.* at ¶ 63. The PSR recommends a two-level upward departure under application note 11 to USSG § 2K2.1 because Haig's offense involved a large quantity of armor piercing ammunition. *Id.* at ¶¶ 114-117. The resulting total adjusted offense level of 14 yields a 15-21 month guideline range of imprisonment. *Id.* at ¶ 117. The PSR recommends that Haig be sentenced at the high-end of that guideline range to 21 months imprisonment, a $5,000 fine, a $100 special assessment, and three years of supervised release. *Id.* at p.23.

### 2) Haig's Objections to the PSR

#### i. Haig's Claim that His Offense Did Not Involve a Large Quantity of Armor Piercing Ammunition is Meritless and Belied by the Physical, Documentary, and Electronic Evidence

Application note 11 to USSG § 2K2.1 provides: "An upward departure may be warranted in any of the following circumstances:…(C) the offense involved large quantities of armor-piercing ammunition (defined at 18 U.S.C. § 921(a)(17)(B))…" The PSR concludes that this upward departure provision applies to Haig's criminal offense and recommends a two-level upward departure. PSR ¶¶ 114-116. Among the facts supporting the upward departure, the PSR identifies: sales records recovered from Haig's residence, which show more than 100 sales of HEAPI, API, and AP ammunition; interviews with Haig's customers who stated they purchased

---

[6] Haig does not contest that he obstructed justice and is subject to the two-level upward adjustment. For details regarding his obstruction of justice see the PSR ¶ 42-44.

armor piercing ammunition from him; execution of the search warrant at Haig's residence, where large amounts of armor piercing ammunition and components were recovered; and evidence that Haig continued to sell armor piercing ammunition after being interviewed by FBI and ATF during October 2-5, 2017. *Id.*

Haig objects to the upward departure by arguing that he only manufactured about 1-2% of the armor piercing ammunition he sold. ECF No. 131 at 9-10. He claims that the other 98-99% of the ammunition that he sold was "from the original manufacturer[.]" *Id.* Haig's objection purports to describe his reloading process, and characterizes it as simply disassembling already-manufactured armor piercing ammunition to ensure it contained the correct amount of powder, and then reassembling the ammunition, which he then resold. *Id.* at 2:13-3:2. He further contends that the upward departure provision does not apply to him because no specific number of armor piercing ammunition cartridges has been determined. *Id.* at 3:7-4:1. Finally, he argues that the definition of a "large quantity" of armor piercing ammunition is "vague." *Id.* at 4:2-18.

Haig's objections are meritless. His description of his ammunition production is obviously false, and easily belied by reviewing the overwhelming physical, documentary and electronic evidence. His objection is built upon a false claim that armor piercing ammunition is widely available in the civilian market. It is not. Haig built his business by promoting to civilian customers the fact that he could, in his own words, "fabricate" or "manufacture" military style ("mil spec") ammunition including AP, API, and HEAPI ammunition. He exploited a niche market by taking the steel core, penetrating bullets out of otherwise legal vintage surplus military ammunition, and installing those deadly projectiles in ammunition that could be shot out of modern assault weapons, such as those used by the Route 91 shooter.

### *Haig's Method of Producing Armor Piercing Ammunition Usable in Modern Assault Weapons*

To understand the falsehood upon which Haig's description of his ammunition business

6

is based, some background information about armor piercing ammunition and particular ammunition cartridges is necessary. The federal ban on armor piercing ammunition, known as the Law Enforcement Officers Protection Act (LEOPA), was enacted in 1986. It essentially banned the manufacture or commerce in ammunition that either contained a penetrating core composed of steel (or six other substances) or contained a bullet jacket of a certain weight, if the ammunition (even if typically used in a rifle) was capable of being used in some type of handgun. The armor piercing ban did, however, create a framework for the Attorney General to exempt certain steel cored or other armor piercing ammunition from the ban if it was found to have a legitimate sporting purpose (the sporting exemption).

In line with that sporting exemption authority, in 1992, the Attorney General, through the ATF, applied the sporting exemption to a military cartridge known as the M2AP or M2 .30/06. *See* Letter from ATF Deputy Director, November 2, 1992, attached here as Exhibit 2. ATF's exemption decision was based on the M2AP being popular and well-established as "suitable for target shooting with rifles due to its accuracy[,]" and being "primarily intended for sporting purposes[.]" *Id.* at 2. Pursuant to the sporting exemption, the M2AP remained in circulation and available for civilian purchase through secondary surplus market sales.

The M2AP is a 30'06 caliber ammunition and its lead bullet (projectile) contains a steel core, which penetrates armor. *Id.* at 1. The cartridge was used widely by the military in machine guns, some long range rifles, and World War II-era rifles known as the M1 Garand and Browning Automatic Rifle (BAR).[7] Modern assault rifles, such as the AR-10 rifles used by the Route 91 shooter, are typically chambered for ammunition that is smaller than 30'06. Typically those modern assault weapons are chambered for and shoot 7.62x51mm NATO (.308) ammunition.

---

[7] The 30'06 cartridge is popular as hunting ammunition since it is capable of taking down large game.

Because a 30'06 cartridge like the M2AP has a longer case containing more gunpowder it: (1) reduces the round capacity of a rifle's magazine, i.e., the rifle cannot hold as much ammunition; and (2) generates significantly more power and felt recoil, making it harder to shoot accurately at a high rate of fire. Thus, modern assault rifles and pistols are almost universally not chambered to shoot 30'06. What the M2AP and the popular 7.62x51mm NATO cartridge *do* have in common is they use the same bullet, a .30 caliber projectile. That means the steel core armor piercing .30 bullet on which the M2AP cartridge is based can be removed and then reloaded into a 7.62x51mm NATO cartridge case.

Because it is exempted from the armor piercing ban and has been produced in large quantities for decades by the U.S. military, there is a significant amount of military surplus M2AP available on the secondary market, including on the Internet. For instance, the following is a posting making M2AP available for sale on the popular firearms auction site Gunbroker.com:



Despite the availability of surplus M2AP—which is a cartridge that does not fit modern assault rifles—armor piercing ammunition in modern assault rifle calibers, such as 7.62x51mm NATO and 7.62x39mm remains illegal. For instance, when ATF was requested to apply the sporting exemption to 7.62x39mm ammunition containing a steel core penetrator like the M2AP, it rejected that request. *See* Letter from ATF Firearms Technology Branch Chief, March 2, 1994, attached here as Exhibit 3. A document recovered from Haig's computer demonstrates his awareness that armor piercing ammunition in 7.62x51mm NATO is illegal. In a document labeled "Ammo Notes," Haig wrote to another individual the following:

> Silver tip – this is raufoss compound with a penetrator. Upon impact the compound detonates and as the penetrator passes through the hard target, it will draw the burning incendiary compound through the hole created by the penetrator and ignite secondary fuels and materials. **7.62NATO is not good for FFL [Federal Firearms License] holders to have!**
> (emphasis added)

This brings us to Haig's specific manufacturing process as shown by the physical evidence located in his manufacturing workshop. Haig purchased surplus M2AP ammunition cartridges or bullets that had been removed from M2AP cartridges. Hundreds of rounds of surplus M2AP were located in his workshop facility, such as in these ammunition boxes:



In order to make illegal 7.62x51mm NATO ammunition using the projectiles from M2AP ammunition, Haig had to himself remove or "pull" the bullets out of their cartridge cases or buy "pulled" bullets sold by others. In Haig's workshop, investigators found boxes containing hundreds of steel cored bullets pulled from M2AP cartridges, and bags of bullets labelled API (armor piercing incendiary), such as these:







In addition to the bullets that he used to make the illegal AP, API, and HEAPI ammunition, Haig also purchased and/or reconditioned thousands of brass cartridge cases, which he would use to make his illegal ammunition. These are some instances from Haig's residence, including packages he recently received and several machines and compounds he assembled apparently for processing brass cartridge cases, as well as buckets of cartridge cases:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



---

[8] The cartridge cases pictured here appear to be for 5.56mm NATO ammunition. As will be discussed, Haig also made illegal armor piercing ammunition in 5.56mm NATO.

1

2

Haig's workshop also contained the gun powder, primers, dyes, paints, and other chemicals he used to create his finished pieces of ammunition with the "pulled" bullets and cartridge cases:

3

4

5

6

7

8

9

10

11

12

13

14

15

16



17

18

19

20

21

22

23

24



14

While Haig tells this Court that he only manufactured a mere 1-2% of the armor piercing ammunition that he sold, the physical evidence proves that claim to be false. The state of Haig's workshop clearly shows that he was making entirely new armor piercing ammunition by sourcing the projectiles from M2AP surplus rounds and then manufacturing illegal 7.62x51mm NATO AP API, and HEAPI ammunition. His motive to do so is that 7.62x51mm NATO ammunition with armor piercing bullets is not available on the civilian market. The federal ban on armor piercing ammunition prohibits the manufacture of such rounds for civilian use, and because such rounds were never produced by the military in quantity, there is no military surplus market in 7.62x51mm NATO.[9]

7.62x51mm NATO-chambered assault weapons are, however, ubiquitous and widely-available. The evidence shows that Haig thought he would profit from filling a niche market of individuals who wanted to purchase such ammunition for their assault weapons and rifles. The marketing he employed makes that clear—and also belies his false objection. The home page of Haig's Specialized Military Ammunition website described his business as one that manufactures specially engineered military ammunition used by the U.S. Special Forces:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[9] According to grand jury testimony, the operator of the Lake City facility, Northrup Grumman subsidiary Orbital ATK, which fulfills major small arms ammunition contracts for the U.S. military, does not even manufacture an armor piercing ammunition cartridge in 7.62x51mm NATO.

Specialized Military Ammunition, LLC (SMA) was started in 1991 as a small business to support the emerging needs of SOCOM for  foreign ammunition cross training and fabrication of mission specific ammunition, from small lots of 100 rounds to 10,000 rounds. SMA prospered with this relationship and continued to expand, eventually entering limited sales to civilians.

In the mid 2000's contracts began to shrink dramatically due to funding decreases, and

private civilian sales began to dominate the majority of our business. We have been fortunate to evaluate many types of foreign and domestic high performance ammunition from .380acp tracer and incendiary rounds, 5.56NATO / .223REem. tracer, raufoss, and penetrator rounds, 7.62NATO / .308Win. raufoss, and tracer rounds as well as foreign military ammunition and incorporate the best of what we tested into our product.

Haig described his business as "fabricat[ing]" military style ammunition, which he sold to civilians, and led his purchasers to believe that they were purchasing ammunition that had originally been specially designed and manufactured for U.S. special forces. In describing the ordering process, Haig reaffirmed that all of the ammunition he sold was "*hand made* and takes time to *fabricate*[] and load" (emphasis added):

16

1
2
3
4
5
6
7
8
9
10
11

We only accept orders by phone.  This is done to protect the customer.  Online shopping carts are best suited for mass production items.  Our ammunition is hand made and it takes time to fabricated and load.  Speaking to us on the phone also allows questions and establishes what the customer really wants to have our ammunition for.  We also can take a few extra days to ship.  This is because we may have to fabricate the ammunition ordered if it's not on the shelf.  Be patient with us and we will always do our best to make sure you get what you want.  Remeber we shoot this ammo also!

12      The benefit to Haig of manufacturing an unavailable armor piercing cartridge that could

13  be shot out of modern assault rifles is actually quite simple: money. Haig sold small packages of

14  this "specialized military ammunition" for large amounts of money. An example can be found

15  in the Route 91 shooter's suite where this 10-round package from Haig's ammunition was found:

16
17
18
19
20
21
22
23
24



Interviews with numerous witnesses also confirmed that they bought armor piercing ammunition that Haig manufactured. For instance, customer M.K. related to investigators that he entered into an agreement with Haig in which M.K. would send brass cartridge cases to Haig who promised to use the cases to create AP and API ammunition, which would be sent to M.K.:

> During their conversation, Haig told ▨▨▨▨ that he could take ▨▨▨▨'s "brass" and reload it into armor piercing ammunition. They did not reach and agreed to price, but Haig indicated that he would only charge ▨▨▨▨ his hourly rate, plus the expense of the powder, primers and armor piercing components. These components were specified in the telephone call as black tip armor piercing and silver tip incendiary ammunition. ▨▨▨▨ was clear that his agreement with Haig called for him [Haig] to reload "armor piercing into [his] brass."

Email communications located on Haig's computer show that his process was to "build" armor piercing ammunition that the customer ordered, such as in this exchange where Haig offered to "build" API in .300 Winchester Magnum caliber, another cartridge that could be based on pulled surplus M2AP projectiles:

> On Tue, Aug 20, 2013 at 2:52 PM, Ammo Acct <smammo@q.com> wrote:
>
> Ok ▨▨
>
> I've made 20 of the high explosive incendiary for you and can build 20 more of incendiary tracer, (made just for you) or I can build armor piercing incendiary.  What would you like the remainder to be?  The HE will run you $4/ea and the API $5/ea.  The incendiary tracer will run you $4/ea.  They will all be 1" high of your zero for 180gr, that was the best I could with my limited access to a .300WM.  I think you we should trade rifles!  I would love to have your .300!
>
> Doug
>
> Doug Haig
> SMA LLC
> www.smammo.com
> 480-658-7507

Thus, in addition to the physical evidence of Haig's ammunition manufacturing process, Haig's

own statements and FBI/ATF's interviews of his customers show that his process was to use armor piercing bullets to "build" new pieces of armor piercing ammunition, which he then sold. His claim that he merely resold already-manufactured armor piercing ammunition after disassembling it to measure the gun powder is simply false in light of the physical, documentary, and electronic evidence.

Haig's process of removing the bullets from M2AP cartridges and then "building" AP, API, or HEAPI ammunition is also confirmed in relation to another caliber of armor piercing ammunition that Haig illegally manufactured and sold. Besides M2AP, there is only one other ammunition cartridge that has ever received a sporting use exemption, the SS109/M855 "green tip" cartridge in 5.56mm NATO caliber. Haig's sales records show he manufactured AP and API, and other ammunition using the steel cored bullets removed from surplus SS109/M855 cartridges. In Haig's "Ammo Notes," he described that his manufacturing process for the 5.56mm AP, API cartridges he sold was to use the penetrator from the SS109/M855 cartridge and add an incendiary mixture. He went on to market those API rounds on his SMA website:



**5.56mm Incendiary with Penetrator**

The 5.56mm M855 incendiary contians the Roufoss incendiary compound with an original USGI M855 penetrator.

Currently in stock - $35/10rds - $70/20rd box

Haig's reference to these cartridges containing an "original [U.S. government issued] M855 penetrator" demonstrates that he was manufacturing illegal 5.56mm API ammunition in a fashion similar to how he was manufacturing illegal 7.62x51mm NATO AP, API, and HEAPI ammunition. Indeed, he marketed yet another version of 5.56mm API ammunition, which he modified by using an M855 penetrator round with Raufoss incendiary material and a tracer component (APIT):

**The 5.56mm Incendiary Tracer with Penetrator**

The 5.56mm Raufoss M855 incendiary tracer contians the Raufoss incendiary compound along with the USGI M855 penetrator as well as a bright ignition / bright trace tracer element that is clearly visible in bright daylight and traces to 500m.

Currently in stock - $40/10rds - $78/20rd box

This ammunition was clearly manufactured by Haig because the legal SS109/M855 cartridge does not contain an incendiary or tracer compound and in its original manufactured state bears a distinctive green tip as depicted here (hence the short name "green tips":



As discussed below, Haig sold thousands of rounds of armor piercing ammunition, which

included 5.56mm AP, API, and APIT ammunition, which he manufactured using bullets pulled out of legal SS109/M855 cartridges. All the evidence belies his claim that 98-99% of the time he merely disassembled already-manufactured ammunition to ensure its powder content and then reassembled it.

While Haig was certainly lying to his customers about having been a manufacturer of ammunition for the country's elite special forces, the condition of his workshop shows that he was not lying about manufacturing the ammunition he sold to those customers. Now that Haig wants to avoid going to prison, he is willing to try and give this Court a highly false and misleading description of how he made the ammunition he sold. The evidence shows that Haig manufactured and sold vastly more than the 1-2% he now claims.

In addition to this overwhelming physical, documentary, and electronic evidence belying Haig's false description of his ammunition manufacturing business, the Court must consider Haig's long and persistent history of lying about his activities. *See* ECF No. 42 at 9:12-18:7. Among other things, he lied to investigators about: the type of ammunition he sold the Route 91 shooter; whether he manufactured the ammunition that he sold; whether the samples of tracer ammunition he gave investigators were the same as the ammunition he sold the shooter; and whether he manufactured and sold nonstandard or modified ammunition. Haig obstructed the investigation into the nature of his ammunition manufacturing business by instructing a witness to lie to FBI and ATF agents about whether he sold ammunition that he manufactured. PSR ¶ 43. Given this history, Haig's claim that he only manufactured 1-2% of the armor piercing ammunition should receive no weight at all.

### The Large Quantity of Armor Piercing Ammunition that Haig Sold

Evidence from the Route 91 shooter's hotel room alone shows that Haig actually manufactured the armor piercing ammunition that he sold, and that he sold large quantities of it.

If Haig only actually manufactured "1-2%" of the armor piercing ammunition he sold, it would have to be a tremendous coincidence that the shooter—just *one* of Haig's many customers—had so much of that armor piercing ammunition in the suite from which the shooting was conducted. Forensic examination by FBI's firearms lab in Quantico Virginia identified armor piercing ammunition, AP, API, and HEAPI manufactured by Haig's reloading press in these four AR-10 assault rifles and one Ruger bolt action rifle, all chambered in 7.62x51mm NATO:











In addition to those five loaded rifles, the FBI testing determined API ammunition that Haig

manufactured was present in four fully loaded magazines located throughout the shooter's suite:





Inside of a trash can, investigators located 27 of the bags in which Haig sold his

ammunition to the shooter. Sixteen of those bags were labeled "7.62 NATO/.308 Win." and was AP or API in nature. This means, not counting ammunition mislabeled as 30'06 and HEI, the shooter purchased at least 160 rounds of 7.62x51mm NATO armor piercing ammunition from Haig:



[10]

While that would be enough in itself to conclude Haig trafficked in large quantities of armor piercing ammunition, records recovered from his residence during execution of the search warrant demonstrate that Haig sold a massive amount of armor piercing ammunition to scores of customers in 26 states. Those seized records cover just the period of October 29, 2016, through July 21, 2017, and are based only on receipts found in Haig's residence on the day of the search. *See* Spreadsheet of Haig Ammunition Sales Records, attached here as Exhibit 4. Recall that Haig

---

[10] The rest of the packaging was labeled as containing high explosive incendiary (HEI) ammunition or AP or API ammunition that was ".30'06 M14E2." This latter designation does not appear to be a recognized military designation for a particular ammunition cartridge. The M-14 was a U.S. military-issued battle rifle that shoots 7.62x51mm NATO ammunition. The Route 91 shooter did not have any firearms chambered in, i.e., capable of firing, 30'06 cartridges, so those packages appear to have contained more AP and API ammunition in 7.62x51mm NATO. Thus, the amount of Haig-produced armor piercing ammunition in the shooter's suite is probably more accurately assessed as at least 270 rounds.

has stated to interviewers and media outlets that he has been engaged in his ammunition business for two decades. The seized records for that narrow slice of time show that Haig sold a total of 2,369 cartridges of AP, API, HEAPI, or APIT ammunition chambered in 7.62x51mm NATO, 5.56mm, or .300 Blackout in seventy-five separate transactions with seventy-two different customers located in the following twenty-six states: Georgia, Tennessee, Texas, Indiana, North Carolina, Minnesota, Pennsylvania, Nevada, Arizona, South Carolina, Washington, Wyoming, Utah, Florida, Missouri, Kentucky, Colorado, Vermont, Wisconsin, Maryland, Oklahoma, New York, Montana, Virginia, and Ohio.

Because they were located primarily in Haig's home office, those records appear to primarily reflect transactions that Haig conducted through the Internet. They do not include sales of AP, API, HEAPI, or APIT that he conducted at the numerous gun shows he attended in different states. For instance, although the Route 91 shooter made multiple purchases from Haig around the same time, there was no receipt for those transactions located in Haig's residence. Haig admits those transactions occurred, which leads to an inescapable inference that he was selling hundreds—more probably thousands—of rounds of AP, API, HEAPI, and APIT at gun shows.

Indeed, while FBI and ATF were executing a search warrant at his residence, Haig was at a machine gun shoot where he set up a table promoting and selling the ammunition he manufactured, including AP, API, and HEAPI. The individual present with Haig, A.F., would later inform FBI and ATF agents that, in an effort to dispose of the ammunition he brought to sell at the shoot, Haig offered to sell A.F. the entire lot of AP, API, HEAPI, and other ammunition for the mere $20 that A.F. had in his pocket. FBI and ATF would later collect twelve

ammunition cans from A.F.[11] In light of all the foregoing evidence, Haig's objection is clearly meritless to the extent it falsely claims that he only manufactured 1-2% of the armor piercing ammunition that he sold.

Where Haig objects that a precise quantity of pieces of armor piercing of ammunition has not been determined, that claim is also meritless since the evidence shows that, at a very minimum, he sold at least 2,529 pieces of armor piercing ammunition based only on the receipts found at his home and the ammunition recovered in the Route 91 shooter's hotel suite. That does not include the ammunition and components seized from his workshop, the thousands of rounds that it is reasonable to estimate he sold at gun shows, and the fact that he states he operated the business for two decades.

Assuming for purposes of argument that Haig—in the decades he was operating his illegal business—sold only 2,529 rounds of AP, API, and HEAPI ammunition, that quantity of armor piercing ammunition is sufficient to supply a 20-soldier rifle platoon with five 25-round rifle magazines per individual soldier. That would enable each of the twenty  soldiers to shoot 125 rounds of armor piercing ammunition. By any reasonable or common sense measure, that is clearly a large quantity of armor piercing ammunition. That is particularly so because armor piercing ammunition is a highly "specialized" and—as Haig's pricing showed—expensive ammunition. Thus, a smaller number of armor piercing cartridges will constitute a large quantity due to its scarcity, "specialized" nature, and cost relative to conventional ammunition. For instance, twenty-round boxes of conventional, non-armor piercing ammunition in 5.56mm NATO and 7.62x51mm NATO are available through sporting goods retailer Cabela's for the

---

[11] A.F. filed  a police report claiming that hundreds of rounds of AP and other ammunition were stolen out of his truck. He told investigators this ammunition was part of the amount sold to him by Haig on the day of the search warrant.

following prices:

| 5.56mm NATO | 55 Grain | FMJ | Per 20 | 3,270 | 1 | Regular Price: $7.99 In Stock ADD TO CART ADD TO WISH LIST |
| 7.62 x 51 NATO | 147 Grain | FMJ | Per 20 | 2,800 | 1 | Regular Price: $20.99 In Stock ADD TO CART ADD TO WISH LIST |

[12]

By contrast, as shown above, Haig sold his armor piercing ammunition in those calibers for prices as high as $78 and $85 for similar or lesser quantities, respectively.

Any way one attempts to measure, it is very clear to the ordinary reasonable person that Haig manufactured and trafficked in a large quantity of armor piercing ammunition. And any reasonable person would know that a person traffics in large quantities of armor piercing ammunition when they manufacture and sell thousands of pieces of that ammunition for years on end, and market and sell it throughout more than half of the United States using the Internet and in-person sales at gun shows. There is no merit to Haig's objection that "a large quantity of armor piercing ammunition" is vague. His is the paradigmatic case of a criminal offense involving a large quantity of armor piercing ammunition.[13]

---

[12] *Available at* https://www.cabelas.com/product/shooting/ammunition/rifle-ammunition/pc/104792580/c/104691780/sc/104532480/winchester-usa-rifle-ammunition/705582.uts?slotId=0 (accessed March 4, 2020).

[13] While there is overwhelming evidence that Haig's offense involved a large quantity of armor piercing ammunition and warrants the upward departure, should the Court not apply the upward departure, the government requests that the Court apply a two-level upward variance. Such a variance is clearly justified by the nature and circumstances of Haig's offense as described in Section II.C.1, *infra*.

28

**ii.  Haig Fails to Meet His Burden to Justify a Downward Departure Based on Extraordinary Family Circumstances**

The sentencing guidelines provide that "[i]n sentencing a defendant convicted of an offense…, family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." USSG § 5H1.6. "Because family responsibilities are considered a discouraged factor, departures are to be used only in 'extraordinary circumstances.'" *United States v. VanHouten*, 307 F.3d 693, 698 (8th Cir. 2002) (quoting *United States v. Bieri*, 21 F.3d 811, 818 (8th Cir. 1994)). A departure on such grounds is only warranted where a family member's condition is potentially life threatening and the defendant is an irreplaceable part of her care. *See, e.g.*, *VanHouten*, *supra*. "As long as there are feasible alternatives of care that are relatively comparable to what the defendant provides, the defendant cannot be irreplaceable." *United States v. Pereira*, 272 F.3d 76, 83 (1st Cir. 2001). "Difficult" and "sympathy evoking" circumstances do not render a case "extraordinary," particularly if a defendant fails to demonstrate that "other relatives could not care for the dependent family members; and (2) that home nursing or other alternative services were not available." *Id.* at 82 (quoting *United States v. Archuleta*, 128 F.3d 1446 (10th Cir. 1997).

Like many criminal defendants seeking to avoid a prison sentence, Haig resorts to claiming that he should be sentenced lightly due to family responsibilities. ECF No. 4:20-6:22. He claims that his family situation is so extraordinary that he should receive a downward departure and probation. This objection is also meritless. Going to prison is never a pleasant or easy experience for a criminal defendant's family, and Haig fails to identify anything extraordinary about his situation that would warrant reducing his recommended prison sentence.

First, as to Haig's argument that his wife is financially dependent on him and suffers from depression, ECF No. 131 at 5:6-8, the PSR indicates that Haig has substantial assets,

29

approximately $1.3 million (PSR ¶ 94), which is clearly sufficient to support his wife during a 21-month period of incarceration. Haig's wife who, despite some reported health concerns, appears capable of obtaining employment, although that would likely be unnecessary given the couple's substantial assets. Indeed in 2017, Haig and his wife reported selling a capital asset for $1,755,956:



| SCHEDULE D (Form 1040) | Capital Gains and Losses | | OMB No. 1545-0074 |
|---|---|---|---|
| Department of the Treasury Internal Revenue Service (99) | ▶ Attach to Form 1040 or Form 1040NR. ▶ Go to *www.irs.gov/ScheduleD* for instructions and the latest information. ▶ Use Form 8949 to list your transactions for lines 1b, 2, 3, 8b, 9, and 10. | | 2017 Attachment Sequence No. 12 |

Name(s) shown on return: **Douglas C and Dorenna F Haig**     Your social security number

**Part I   Short-Term Capital Gains and Losses - Assets Held One Year or Less**

| See instructions for how to figure the amounts to enter on the lines below. This form may be easier to complete if you round off cents to whole dollars. | (d) Proceeds (sales price) | (e) Cost (or other basis) | (g) Adjustments to gain or loss from Form(s) 8949, Part I, line 2, column (g) | (h) Gain or (loss) Subtract column (e) from column (d) and combine the result with column (g) |
|---|---|---|---|---|
| 1a  Totals for all short-term transactions reported on Form 1099-B for which basis was reported to the IRS and for which you have no adjustments (see instructions). However, if you choose to report all these transactions on Form 8949, leave this line blank and go to line 1b . . . . . . . . . . . . | 1,755,956. | 1,550,991. | | 204,965. [14] |

Even if Haig is sentenced to the 21-month term of imprisonment, he would serve less than that term due to sentencing credits applied by the Bureau of Prisons. Further, there is nothing extraordinary about Haig's wife being depressed about the disruption that Haig's prosecution and guilty plea has brought to their family. Moreover, there is no indication that she possesses a diagnosed mental illness, the care and treatment of which would require Haig's irreplaceable role. The only thing extraordinary in this case is that Haig has assets of at least $1.3 million, which are more than sufficient to tide his family over while he serves his prison sentence.

Second, Haig's father's dementia is also not an extraordinary fact supporting a departure.

---

[14] Haig has provided no financial documents to Probation and it does not appear that Haig has fully disclosed his financial condition.

While it is certainly unfortunate that Haig's father has the condition and experiences distress when Haig misses a visit, that is not the type of familial relationship or responsibility that would be considered an extraordinary reason for a downward departure. Haig's father is currently housed and cared for in an assisted living facility. Haig is therefore not an irreplaceable part of the father's care, which is carried out by others. Moreover, Haig's substantial assets will insure that the father is cared for while Haig serves his prison sentence. To the extent Haig claims that his father would "become[] suicidal" if denied a daily visit from Haig, such a claim seems implausible and unsupported by any documentation. And, in any event, because Haig's father appears to reside in a professionally operated living facility, that type of care would ensure that Haig's father does not harm himself. Cognitive decline is an unfortunate reality of the aging process but, although worthy of sympathy, there is nothing unique or extraordinary about this circumstance of Haig's family life.

Haig cites to caselaw that does not support his claim that his family responsibilities are so extraordinary that he should receive a probationary sentence. He quotes from *United States v. White*, 301 F. Supp. 2d 289 (S.D.N.Y. 2004), in which the indigent defendant was still sentenced to a range of 24-30 months in prison after a departure based on her being the sole support for six children ages 5 through 14 who were certain to be enrolled in foster care when she was imprisoned. *Id.* Haig, by contrast, is far from indigent, has no minor children, and clearly has resources sufficient to sustain his family while he serves a 21 month prison sentence, which is less than the *White* defendant received even after a departure. The same points of distinction apply to the authorities cited within *White*. *See, e.g.*, *United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997) (applying departure where, among other impacts on family unit, defendant's wife and two children age eight and nine would have been relegated to public assistance leaving "extremely vulnerable dependents with no alternative means of support"). Haig's family circumstances are

not unique or extraordinary and do not warrant a lesser sentence.

**C. Given the Nature and Circumstances of Haig's Crime, the Court Should Impose a 21 Month Prison Sentence**

**1) Nature and Circumstances of the Offense**

*The Route 91 Shooter's Use of Haig-Manufactured Ammunition During the October 1 Massacre*

Haig has frequently tried to perpetuate the idea that the Route 91 shooter did not use any of his ammunition during the October 1 shooting massacre. This statement is belied by the forensic firearm evidence, which shows that the shooter used the explosive/incendiary armor piercing ammunition that Haig sold to him. Moreover, it was Haig's marketing and sale of API and HEAPI ammunition, which appears to have given the shooter confidence that he would have the military style ammunition necessary for inflicting as much carnage as possible.

As detailed above, Haig's offense involved the widespread marketing and promotion to civilians of military style ammunition. Among the many types of ammunition he manufactured, Haig made and sold API and HEAPI rounds, which is armor piercing ammunition loaded with explosive and incendiary compounds, sometimes referred to as "Raufoss" rounds. Such armor piercing/explosive/incendiary bullets are designed to penetrate through metal and ignite heavy fuels, such as diesel and kerosene. Haig was aware of this as demonstrated by what he wrote in the "Ammo Notes" document referenced above:

> Sea green tip – this is Raufoss incendiary.  This is the most powerful incendiary compound that is currently available in the military and civilian worlds.  This compound is 60% more powerful grain for grain than IM 23.  It is the only one which will reliably ignite kerosene based fuels.  The sparks radiating from point of impact is the brisance (8' for 5.56 and 10' for 7.62mm) which helps to vaporize the kerosene and allow it to reach a volatile ratio with atmospheric oxegen. [*sic*]  The flame front diameter will be twice that of standard incendiary however the scorch mark left on a steel target will be the same as IM 23.  This is due to the roiling effect of the secondary explosion.

> Silver tip – this is raufoss compound with a penetrator.  Upon impact the compound detonates and as the penetrator passes through the hard target, it will

draw the burning incendiary compound through the hole created by the penetrator and ignite secondary fuels and materials.  7.62NATO is not good for FFL holders to have!

Haig also advertised the explosive and destructive power of this ammunition on his website:



Elsewhere, there are examples of Haig touting the destructive ability of his API and HEAPI ammunition when trying to arrange customer orders:

1       As noted above, investigators and forensic examiners determined the Route 91 shooter

2  had five rifles and various rifle magazines loaded with Haig's API ammunition. Also located and

3  matched to Haig's reloading press were cartridges of HEAPI, which are designated by the "sea

4  foam green" tip Haig mentioned and a red band:[15]



These particular HEAPI cartridges were located in the only bolt action rifle found in the Route

91 shooter's vast arsenal:



---

[15] For details related to the HEAPI ammunition located in the shooter's suite, *see* FTD General Examination Worksheet for Evidence Item 38, attached here as Exhibit 5.

The shooter appears to have intended to use that bolt action rifle for long-distance, high precision shots that would deliver the explosive, fuel-igniting payload of the HEAPI cartridges purchased from Haig.

As investigation of the shooting scene would reveal, the Route 91 shooter tried unsuccessfully to create a huge explosion and conflagration by shooting into large aviation fuel tanks adjacent to the concert venue. Based on the position of those tanks relative to the concert field and the shooter's position in the hotel suite, it is clearly apparent that he hoped to fire into and explode the fuel tanks with HEAPI or API ammunition. Explosion of the tanks would create a diversion, kill or maim those nearby, and force the helpless concert goers to flee away from the exploding tanks, but into the shooter's field of fire from the Mandalay Bay suite:



Investigators located two large bullet strikes with explosive/incendiary residue on the tanks. The tank walls, however, proved too thick to be penetrated by Haig's ammunition:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



The forensic evidence shows that, during the attack, the shooter actually did use the API

ammunition that Haig sold him. Forensic toolmark analysis shows that eight of the expended cartridge cases found in the shooter's suite were fired from two of the long-range, 7.62x51mm NATO rifles in the shooter's arsenal.[16] This rifle—equipped with a stabilizing bipod, long range rifle scope, and found loaded with Haig's API ammunition—fired six shots during the attack:



This rifle—also equipped with a stabilizing bipod, long range rifle scope, and also found loaded with Haig's API ammunition—fired another two shots:

---

[16] *See* Laboratory Report – Firearms/Toolmarks, June 27, 2018, attached here as Exhibit 6.

This evidence indicates that these were the firearms the shooter used to attempt to explode the fuel tanks. The rest of the cartridge cases analyzed from the shooter's suite, 1,049 in total, were all from ammunition cartridges of the smaller 5.56mm NATO caliber. No 5.56mm AP or API ammunition was located in the suite, which means the shooter used conventional ammunition out of his rifles that were chambered in that caliber. All of these rifles were AR-15's equipped with bump stocks and reflex or iron sights, a configuration very ill-suited to precision long-range shots. Thus, the bullets fired into the fuel tanks could only have come from the rifles loaded with Haig's ammunition.[17]

Thus, it is quite clear that the Route 91 shooter's plan to murder as many people as possible at the concert venue was made to seem more feasible by Haig's marketing and sale of API and HEAPI ammunition. Confident in the belief that he had purchased from Haig the type of "specialized military ammunition" that would allow him to magnify the slaughter by exploding the fuel tanks, the shooter executed his plan. In this way, Haig's reckless and illegal commerce in destructive, military-style ammunition made the attack more likely to occur. The shooter's use of Haig's ammunition during the massacre makes this clear.

*Haig's Manufacture and Widespread Marketing of Military-Style Armor Piercing Ammunition Useable in Modern Assault Weapons is Precisely the Type of Danger Congress Sought to Combat When Enacting the Federal Ban*

Haig's contribution to the occurrence of the October 1 shooting is a circumstance serious and concerning enough to warrant sending him to prison as recommended by the PSR and the government. But his conduct is even worse than that. Haig's widespread unlicensed distribution of illegal armor piercing ammunition to scores and scores of civilian customers throughout the

---

[17] Comparative forensic toolmark examination is not possible on ammunition that has been deformed and then exploded and burned

United States warrants strong punishment in itself.

Armor piercing ammunition is illegal to manufacture for sale to civilians. Congress made the decision to effectively ban civilian possession of armor piercing ammunition based on widespread concern about law enforcement officers being harmed by criminals. During drafting of the ban, one senator provided a detailed explanation of the physical risk posed to law enforcement officers by the type of ammunition Haig manufactured:

> Since the development of Kevlar and similar materials used in bulletproof vests more than a decade ago, flexible body armor has saved the lives of more than 500 police officers. From 1974 to 1983, the number of law enforcement officers slain in the line of duty fell 43 percent. Many of those lives were saved by bulletproof vests; a single cop-killer bullet could have rendered any of those vests useless. In a test conducted by the California State Police, one armor-piercing bullet-the KTW variety-penetrated four bulletproof vests and five Los Angeles County telephone books stacked behind them. This is ammunition of no legitimate use to hunters or target shooters.
> Proceedings and Debates of the 99th Congress, Second Session, Manufacture And Importation Of Armor-Piercing Bullets, 132 Cong. Rec. S2135-02, 1986 WL 769762, p.7 (March 6, 1986).

Another senator explained that the law was intended to "…limit the proliferation of ammunition which might be sought by persons determined to engage in crime at all costs, but which has no legitimate sporting purpose." *Id.* at 3. A third senator pointed out that the ban on armor piercing ammunition was widely supported by police and law enforcement organizations throughout the country. *Id.* at 6.[18] Finally, a fourth senator noted that the law would provide "ample notice" to ammunition manufacturers like Haig that their activity was prohibited. *Id.* at 4 ("This definition provides ample notice to commercial manufacturers and to individuals who load their own

---

[18] ("Madam President, police chiefs and police departments around the country know all too well the grave danger posed by these armor-piercing bullets. The legislation that we have before us today has been endorsed by the National Association of Police Organizations, the Federal Law Enforcement Officers Organization, the Fraternal Order of Police, the International Brotherhood of Police Organizations, the International Union of Police Organizations, the National Sheriffs Association, the International Association of Chiefs of Police, the National Organization of Black Law Enforcement Officers, and literally hundreds of State and local law enforcement organizations.").

1    cartridges of the types of projectiles covered by the statute.").

2         The risks and policy interests motivating Congress's decision to enact the ban have only

3    intensified in the decades since it was passed. This is due in part to the radical evolution in assault

4    weapon rifle and pistol platforms. Assault weapons capable of firing the ammunition Haig

5    manufactured are now ubiquitous and easily available in many states. Those weapons have also

6    become even smaller and more concealable, permitting large caliber assault cartridges to be shot

7    out of pistols. For instance, the AP, API, and HEAPI ammunition that Haig sold the Route 91

8    shooter can be fired out of this Galil ACE Pistol, which fires 7.62x51mm NATO ammunition:

9

10

11

12

13   

14

15

16

17   The 5.56mm API and APIT ammunition that Haig manufactured and sold can be fired out of

18   pistol-sized versions of the deadly AR-15 assault rifle, such as this Extar EXP-556 assault pistol:

19

20

21

22   

23

24

40

These weapons are known to be carried and sold by criminals and felons, including in the District of Nevada. *See, e.g.*, *United States v. Steven Guy Desjarlais-Frost*, Case No. 2:16-cr-00177-JCM-PAL, ECF No. 1 at 3:17-4:4 (felon being charged with possession of Extar EXP-556 assault pistol). And the technology only continues to evolve and get smaller as with this pocket pistol capable of firing the 7.62x39mm assault rifle cartridge used by the AK-47 assault rifle:



Haig's indiscriminate marketing and sale of his armor piercing ammunition made it available to any criminal or felon with an internet connection and the motive to obtain ammunition capable of penetrating body armor, police vests, fuel tanks, or vehicles. Haig's criminal conduct is squarely in the heartland of the evil that Congress sought to combat with the ban on civilian possession of armor piercing ammunition.

Given Haig's criminal and reckless dissemination of AP, API, HEAPI, and APIT ammunition throughout the country, it is unsurprising that this destructive, military-style ammunition found its way into the hands of a person who did something truly horrific with it.

Society will have to contend with any future criminal acts committed using the thousands of rounds of armor piercing ammunition that Haig has already circulated throughout the United States. This in itself warrants serious punishment.

### 2) History and Characteristics of the Defendant

While Haig has very limited prior contact with the criminal justice system, it is notable that his other arrest was for doing something dangerous and illegal with a firearm. PSR ¶ 64. More importantly, Haig's offense of conviction in this case actually occurred over multiple decades during which he continually violated the law. Haig is an educated and intelligent person with a career in a high earning, highly specialized field. He was also permitted to work on important defense contracts and projects. By all appearances, Haig has a loving and supportive family unit. Despite all those opportunities and positive influences, he elected to set up an illegal business, put his career and his family's financial security at risk, and jeopardize the safety of the community.

The government has pronounced fears that, despite Haig's status as a convicted felon, he will attempt to continue operating an ammunition manufacturing business through other individuals. The government's understanding is that Haig is reported by Probation to have transferred his ammunition manufacturing equipment and ammunition to A.F. with the understanding that A.F. will operate an ammunition manufacturing business and Haig will share in the profits when the business becomes profitable. Moreover, the government anticipates that Haig may try to continue owning firearms though other individuals. Haig owned numerous machineguns, which he is reported by Probation to have transferred to family members.

Haig revealed his character and penchant for lying and obstructing throughout the investigation in this case. To save himself and prevent discovery of his illegal business, he repeatedly, on multiple separate occasions, lied to FBI and ATF agents who were working

42

feverishly and under tense, exhausting circumstances to understand the events and evidence surrounding the Route 91 shooting. After he lied to those agents and pointed them in the direction of another witness, he immediately began trying to influence that witness to also lie to those agents. Haig also lied to the public during several lengthy media appearances. And Haig continues to lie about the nature of his business and criminal conduct.

### 3) Need to Reflect the Seriousness of the Offense and to Promote the Rule of Law

The Supreme Court has observed that "[t]he very structure of the Gun Control Act demonstrates that Congress ... sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218, 96 S.Ct. 498, 502, 46 L.Ed.2d 450 (1976). Violations of the Gun Control Act are serious criminal offenses. *See, e.g.*, *United States v. Prince*, No. 09-10008-JTM, 2010 WL 2653451, at *2 (D. Kan. 2010) ("[M]aking a false statement to a federal firearms licensee is a serious offense…"). As another court recognized: "It is obvious that the requirements of the GCA and supporting regulations were intended to be stringently followed." *Lumber Jack Bldg. Centers v. Alexander*, 536 F. Supp. 2d 804, 810 (E.D. Mich. 2008). The Supreme Court has also observed that the inspection regime that flows from the licensing process is essential to ensure compliance with the Act's purpose to deter violations of the licensing laws. *United States v. Biswell*, 406 U.S. 311, 316, 92 S. Ct. 1593, 1596, 32 L. Ed. 2d 87 (1972) ("[I]f inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential.").

Haig's particular violations of the Gun Control Act are extremely serious and reflect a deliberate, calculated, and multifaceted plan to violate the Act. Haig knew that federal law required him to have a license to operate an ammunition manufacturing business. He also knew that the AP, API, and HEAPI ammunition that he wanted to manufacture and sell to civilians: (1) required another federal firearms license to legally manufacture; and (2) even that license

would not permit him to sell armor piercing ammunition to civilians. So Haig effectively committed *two* separate crimes under the Gun Control Act, a fact which multiplies the seriousness of his criminal conduct and evidences an utter contempt for the regulatory framework that Congress enacted with the Gun Control Act and LEOPA.

### 4) Need to Afford Adequate Deterrence

Firearms and ammunition are ubiquitous in our society and the ATF has limited resources to apply, inspect, and enforce the Gun Control Act's licensing requirements. The burden of ensuring compliance with licensing requirements is great enough in itself when ATF is dealing with the well over 100,000 individuals who actually applied for and legally obtained federal firearms licenses.[19] That burden becomes even more onerous, however, when individuals like Haig deliberately flout federal firearms law and set up illegal businesses that are not subject to any regulatory inspection or tracking regime. It is, therefore, critically important to send a strong deterrent message when an individual is discovered to have set up and operated a business that is illegal under the Gun Control Act.

Because of his connection to the Route 91 shooting massacre, great attention has been focused on Haig and his activities in relation to his illegal business. Sentencing him to a 21-month prison sentence would send a strong and visible message to individuals contemplating illegal firearms or ammunition businesses of their own. Further, it would reaffirm the deterrent message that Congress sought to send when criminalizing the civilian manufacturer, sale, and ownership of armor piercing ammunition. To do otherwise would send the counterproductive message that it is not a serious offense to engage in the widespread marketing of illegal firearms and

---

[19] ATF statistical data indicates that, in 2018, there were 134,191 federal firearms licensees. United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update – 2019*, p.18, Exhibit 10, *available at* https://www.atf.gov/firearms/docs/report/2019-firearms-commerce-report/download (accessed March 5, 2020).

ammunition—even when sold to dangerous individuals such as the Route 91 shooter.

On the level of specific deterrence, it seems important and necessary to impress upon Haig that his conduct was extremely serious and extremely dangerous. As noted above, it is concerning that Haig still wants to be involved in firearms and ammunition by transferring his operations to A.F., who is supposed to kick profits back to Haig when the business becomes profitable. It is also problematic that Haig has reportedly transferred his numerous firearms to family members. Finally, it is especially problematic that he continues to lie about how his illegal business operated. This suggest that he does not take his conduct seriously or recognize it for the dangerous, criminal activity that it is. Only a significant prison sentence will impress upon Haig the gravity of his crime and deter him from committing new federal firearms law violations.

### 5)  Need to Avoid Unwarranted Sentencing Disparities

In order to "to promote national uniformity in sentencing[,]" Congress enacted 18 U.S.C. § 3553(a)(6), the sentencing factor regarding "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *United States v. Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007). *See also United States v. Florez*, 447 F.3d 145, 157 (2d Cir. 2006) (primary goal of § 3553(a)(6) is to minimize sentencing disparity at the nationwide level). Likewise, "[t]he purpose of the sentencing guidelines is 'to eliminate disparities among sentences nationwide.'" *United States v. Franklin*, 785 F.3d 1365, 1371 (10th Cir. 2015) (citation omitted).

The United States Sentencing Commission does not appear to have conducted statistical analysis of sentencing in cases involving illegal dealing of firearms or ammunition under 18 U.S.C. § 922(a)(1). The government's survey of sentencings under the statutory subsection reveals that district courts throughout the United States usually impose prison sentences of approximately 24 months for defendants convicted of violating Section 922(a)(1)(A), which

45

criminalizes dealing in firearms without a license. *See* Table of Sentencing Outcomes, attached here as Exhibit 7. Indeed, prison sentences of at least two years appear to be the normal course in cases involving facts much less egregious than Haig's offense. While Haig's conviction comes under the (B) subsection of Section 922(a)(1), both prongs of the illegal dealing prohibition are punishable by 5 years and the caselaw is treated interchangeably. The 21-month prison sentence recommended by the government and Probation would be consistent with the national trend. A disparity in sentencing practice would occur if the Court sentenced Haig to a shorter term of imprisonment.

### III.   Conclusion

WHEREFORE, after consideration of the included facts, points, authorities, exhibits, and arguments, the United States respectfully requests that this Court sentence Haig to 21 months imprisonment followed by three years of supervised release.

DATED this 9th day of March, 2020.

Respectfully submitted,

NICHOLAS A. TRUTANICH
United States Attorney

//s// Patrick Burns
_____

PATRICK BURNS
Assistant United States Attorney

46

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**<u>CERTIFICATE OF SERVICE</u>**

I certify that I am an employee of the United States Attorney's Office. A copy of the foregoing **GOVERNMENT'S SENTENCING MEMORANDUM** was served upon counsel of record, via Electronic Case Filing (ECF).

DATED: this 9th day of March, 2020.

//s// Patrick Burns

_____

PATRICK BURNS
Assistant United States Attorney